FILED
FEBRUARY 25, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JH

| | | |
|---|---|---|
| ORIX CAPITAL MARKETS, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. |
| v. | ) | |
| | ) | |
| RICHARD J. NATHAN, | ) | |
| | ) | |
| Defendant. | ) | |

**08 C 1129**

**JUDGE NORGLE
MAGISTRATE JUDGE ASHMAN**

## COMPLAINT

**NOW COMES** the Plaintiff, ORIX CAPITAL MARKETS, LLC by and through its attorneys, Chapman and Cutler LLP, and for its Complaint against defendant RICHARD J. NATHAN, respectfully states as follows:

### THE PARTIES

1. Plaintiff ORIX Capital Markets, LLC *("ORIX")* is a Delaware limited liability company, with its principal place of business located in Dallas, Texas.

2. Defendant Richard J. Nathan *("Nathan")* is an individual who resides, upon information and belief, in Los Angeles, California.

### JURISDICTION

3. Jurisdiction is proper pursuant to 28 U.S.C. §1332 because the parties are citizens of different states, and the matter in controversy exceeds the sum of $75,000, together with supplemental jurisdiction pursuant to 28 U.S.C. §1367.

### VENUE

4. Venue is proper in this district because the contract which forms the basis of this complaint expressly states, in relevant part, "any suit, action or other legal proceeding relating to

this Guaranty may be brought only in the Circuit Court of Cook County or Federal District Court for the Northern District of Illinois, Eastern District . . . ." Further, venue is proper in this district pursuant to §1391(a), in that the contract which forms the basis of this complaint originated in this district.

### FACTS

5. On or about February 28, 2006, ORIX's predecessor in interest, ORIX Real Estate Capital, Inc. *("OREC"*, and together with ORIX and their respective successors and assigns, hereinafter sometimes referred to individually or collectively, as the context requires, as the *"Lender"),* with an office located in Chicago, Illinois, and The Landings Florida LLC (*"The Landings"*), entered into a Note (the *"Note"*) and a Loan and Security Agreement (the *"Loan Agreement"*), whereby OREC agreed to and did loan $26,500,000 (the *"Loan"*) to The Landings, all related to property commonly known as Bristol Court Apartments, 3655 Westchase Village Lane, Norcross, Georgia 30092 (the *"Property"*). True and correct copies of the Note and Loan Agreement are attached hereto as Exhibits A and B, respectively.

6. In connection with the Loan, on February 28, 2006, The Landings also executed a "Deed to Secure Debt, Assignment of Leases and Security Agreement" (*"Security Deed"*) in favor of Lender, which was dutifully recorded with the Clerk of Gwinnett County, Georgia, a true and correct copy of which is attached hereto as Exhibit C.

7. In further connection with the Loan, on February 28, 2006, The Landings and Nathan, individually, executed an "Environmental Indemnity Agreement" (*"Environmental Indemnity"*), a true and correct copy of which is attached hereto as Exhibit D.

8. As one of the conditions of entering into the Note, Loan Agreement, and the other documents evidencing and securing the Loan (collectively, the *"Loan Documents"*), Nathan

entered into a "Guaranty (Carveout)" (the *"Carveout Guaranty"*) in favor of Lender, a true and correct copy of which is attached hereto as Exhibit E.

9. Pursuant to the terms of the Carveout Guaranty, Nathan agreed to be personally liable for the payment and satisfaction of: (a) all "Losses and Expenses" arising upon the occurrence of certain events and circumstances as set forth in Section 1(a) of the Carveout Guaranty, and (b) all "Indebtedness and Obligations (including Losses and Expenses)" arising upon the occurrence of certain events and circumstances as set forth in Section 1(b) of the Carveout Guaranty, with such liabilities and obligations being collectively defined in Section 1 of the Carveout Guaranty as *"Guarantor's Liabilities"*. *See* Carveout Guaranty, §§1 (a) and (b).

10. "Losses and Expenses" are defined at page 4 of the Carveout Guaranty to mean "(a) all losses, damages, direct or consequential, and liabilities which Lender or any subsequent holder of the Note may pay or incur, including protective advances and the costs of appraisals, site investigation, engineering reports and surveys, audits or other investigations and (b) all reasonable attorneys' fees, court costs and other legal expenses and all other costs and expenses of any kind which Lender or any subsequent holder of the Note may pay or incur in attempting to collect, compromise or enforce, in any respect, any of Guarantor's Liabilities, whether or not suit is ever filed, and whether or not in connection with any insolvency, bankruptcy, reorganization, arrangement or other similar proceeding involving Borrower, Guarantor or any other guarantor. If Lender pays any such cost or expense, 'Losses and Expenses' shall also include interest at the Default Rate on any such payment from the date of such cost or expenses is incurred until repayment to Lender in full."

11. The term *"Indebtedness"* is defined in the Loan Agreement as meaning "all obligations of Borrower to Lender from time to time for the payment of money, including without limitation, the principal amount of the Loan outstanding from time to time, all Accrued

Interest, the Exit Fee, all Charges and all amounts expended by Lender or on its behalf which Borrower is obligated to reimburse, including interest, as provided in the Loan Documents". *See* Loan Agreement, Schedule 1.2. The term "Obligations*"* is further defined in the Loan Agreement as "all or any payment or performance obligations of Borrower or Guarantors to Lender under the Loan Documents". *Id*.

12. The events and circumstances for which Nathan is personally liable to Lender for all "Losses and Expenses" under Section 1(a) of the Carveout Guaranty are set forth in Exhibit F attached hereto. The events and circumstances for which Nathan is personally liable to Lender for all "Indebtedness and other Obligations" under Section 1(b) of the Carveout Guaranty are set forth in Exhibit G attached hereto.

13. On or about February 28, 2006, OREC, pursuant to an Assignment and Assumption Agreement, assigned to ORIX, *inter alia*, the Note, the Loan Agreement, the Carveout Guaranty, and the other Loan Documents. A true and correct copy of this Assignment and Assumption Agreement is attached hereto as Exhibit H.

14. Thereafter, starting in May, 2006, and continuing through August, 2007, The Landings made requests for, and the Lender funded, numerous "Advances" (as defined in Schedule 1.2 to the Loan Agreement) totaling approximately $1.7 million, all pursuant to Section 3.2 of the Loan Agreement. At the time each Advance was made between May, 2006 and August, 2007, The Landings, pursuant to Section 4.2 of the Loan Agreement, *remade* each and every representation and warranty contained in the Loan Agreement. At no time when each Advance was made, or thereafter, did The Landings inform or state to Lender that any representation or warranty contained in the Loan Agreement was not true, or was otherwise inaccurate in any way.

15. In May 2007, for good and valuable consideration, Nathan, The Landings, another guarantor, Commercial Ventures, Inc. *("CVI")*, and Lender entered into a "First Amendment to Loan and Security Agreement and Guaranty (Payment) and Reaffirmation of Guaranties" (the *"First Amendment"*), a true and correct copy of which is attached hereto as Exhibit I.

16. Under and pursuant to the First Amendment, The Landings represented, *inter alia*, that all of the representations and warranties contained in the Loan Agreement were true and correct as of May, 2007, that there were no defaults under the Loan Documents, and that there had been no material adverse change in the financial condition of The Landings. Nathan, by his signature to the First Amendment as a guarantor, further reaffirmed all of the representations and warranties contained in the Carveout Guaranty.

17. However, and unbeknownst and undisclosed to Lender, as of that time and throughout most of 2007, The Landings had failed to pay, as and when due, several of its debts and obligations relating to the Property, and, as a consequence, a number of entities recorded Materialman's and Mechanic's Liens (collectively, the *"Liens"*) against the Property relating to services or materials previously provided to the Property, all of which constituted defaults under the Loan Documents. The Liens include the following:

   (a) Carpet South, Inc., filed February 27, 2007, recorded in GED Book 2057, page 44, Gwinnett County, Georgia, for a claim becoming due at least as of November 30, 2006;

   (b) Allsouth Renovations, Inc., filed March 5, 2007, recorded in GED Book 2061, page 242, Gwinnett County, Georgia, for a claim becoming due at least as of December 6, 2006;

      (c)    Century Turn Key LLC, filed March 7, 2007, recorded in GED Book 2063, page 183, Gwinnett County, Georgia, for a claim becoming due at least as of January 10, 2007;

      (d)    Eisner's Superior Flooring, Inc. filed March 23, 2007, recorded in GED Book 2069, page 122, Gwinnett County, Georgia, for a claim becoming due at least as of December 28, 2006;

      (e)    Southeastern Appliance & Lighting Co., filed March 28, 2007, recorded in GED Book 2071, page 242, Gwinnett County, Georgia, for a claim becoming due at least as of December 29, 2006;

      (f)    Athens-Atlanta Asphalt Company, Inc., filed July 18, 2007, recorded in GED Book 2124, page 268, Gwinnett County, Georgia, for a claim becoming due at least as of April 24, 2007; and

      (g)    HGA Landscape Services, LLC, filed September 24, 2007, recorded in GED Book 2162, page 99, Gwinnett County, Georgia, for a claim becoming due at least as of September 10, 2007.

Copies of the Liens noted above are attached hereto as Group Exhibit J. The total amount of obligations and indebtedness claimed by the Liens is $399,997.13. Upon information and belief, at the time each of the Liens were filed, most if not all of the debts and financial obligations relating thereto were more than sixty (60) days past due.

      18.    Under and pursuant to Section 5.1.7(n) of the Loan Agreement, The Landings covenanted and agreed that it shall "not incur any debts or financial obligations other than the Obligations and normal accounts payable in the ordinary course of business of not more than $200,000 in the aggregate and which are not more than sixty (60) days past due."

Case 4:07-cv-99999 Document 658 Filed 02/25/2008 Page 6 of 17

19. Subsequently, in October 2007, and among other "Events of Default" under the Loan Documents, the Note and Loan Agreement went into payment default, which constituted a further "Event of Default" under the Loan Documents, and notice thereof was sent to Nathan by Lender on October 9, 2007, a true and correct copy of which is attached hereto as Exhibit K. Thereafter, on November 5, 2007, after the payment default was not cured, Lender sent Nathan a notice of acceleration and demand for payment of all indebtedness under the Loan Documents, a true and correct copy of which is attached hereto as Exhibit L.

20. On November 5, 2007, ORIX, pursuant to an Assignment and Assumption Agreement *("Assignment")* re-assigned to OREC, *inter alia*, the Note, the Loan Agreement, the Carveout Guaranty, and the other Loan Documents. A true and correct copy of this Assignment is attached hereto as Exhibit M. Thereafter, on or about November 30, 2007, OREC, pursuant to an Assignment and Assumption Agreement, further re-assigned back to ORIX the Note, Loan Agreement, Carveout Guaranty and the other Loan Documents. A true and correct copy of this Assignment is attached hereto as Exhibit N. Additionally, the Note was endorsed by OREC to ORIX pursuant to an Allonge dated November 30, 2007, a true and correct copy of which is attached hereto as Exhibit O. Further, on November 30, 2007, the reassignment of the Loan Agreement, First Amendment, Security Deed, and other Loan Documents to ORIX from OREC was evidenced in a recordable "Transfer and Assignment of Deed to Secure Debt, Assignment of Leases and Rents and Security Agreement and of Assignment of Rents, Leases and Other Income", a true and correct copy of which is attached as Exhibit P, and which was thereafter recorded with the Gwinnett County, Georgia Recorder's office on December 3, 2007. Thus, ORIX currently is the holder of all of Lender's rights, title and interest in, to and under the Note, the Loan Agreement, the Carveout Guaranty, and the other Loan Documents.

21.    After the notice of the Events of Default were served upon Nathan, ORIX inspected the subject Property and discovered that, *inter alia,* a number of units in the Property had significant mold infestation, which constituted a Hazardous Substance under the Loan Agreement and the Environmental Indemnity.  ORIX subsequently developed and implemented a plan of remediation to remove this Hazardous Substance from the Property.

22.    Given the Events of Default as outlined above, and the failure of The Landings to pay the accelerated amounts due under the Loan Documents, ORIX exercised certain remedies available to it under a power of sale contained in the Security Deed and, on December 4, 2007, after advertising the Property for sale pursuant to the Loan Documents (including the Security Deed) and applicable Georgia law, ORIX was the successful bidder at sale for the Property, at a bid of $22,000,000 for the Property, and $500,000 for Personal Property (as defined in the Loan Documents) located on or appurtenant to the Property.  This bid was subsequently confirmed by the Superior Court of Gwinnett County, Georgia, in Civil Action No. 07A110109, on February 19, 2008, a true and correct copy of which is attached hereto as Exhibit Q.  Upon confirmation of the sale of the Property and Personal Property as described above, there remain Indebtedness and Obligations (including certain but not all of the Losses and Expenses) of $5,687,732.37 (the *"Deficiency Amount"*), with that Deficiency Amount of $5,687,732.37, plus any additional current or subsequently accruing interest, costs, attorney's fees, and other Losses and Expenses therefore due and owing Lender from Nathan under Section 1(b) of the Carveout Guaranty, and separate liability equal to all Losses and Expenses under Section 1(a) of the Carveout Guaranty, in an amount to be proven at trial, but in no instance less than $75,000.  In addition, interest at the Default Rate is due and owing on all Losses and Expenses paid or incurred by Lender until repaid in full.

## COUNT I
### BREACH OF CARVEOUT GUARANTY

23. ORIX hereby restates paragraphs 1-21 of this Complaint as is fully set forth herein.

### LIABILITY UNDER SECTION 1(b) OF CARVEOUT GUARANTY

24. Nathan is liable for all of the remaining Indebtedness and Obligations due Lender under the Carveout Guaranty by virtue of the occurrence of several events and circumstances which are identified in Section 1(b) of the Carveout Guaranty.

**1. Section 1(b)(i)**

25. Section 1(b)(i) of the Carveout Guaranty states that "Guarantor agrees to be personally liable for the payment and satisfaction of . . . (b) All of the Indebtedness and other Obligations (including Losses and Expenses) in the event of. . . (i) any fraud or material misrepresentation by or on behalf of [The Landings] (including its employees, agents, Affiliates and attorneys-in-fact) in connection with the Loan, including the Initial Disbursement, any Advance, obtaining any consent or determination from Lender or the submission of financial information." The Landings committed fraud and made several material misrepresentations to Lender throughout the term of the Loan.

26. First, The Landings failed to advise Lender of the Liens at and as "Advances" were made to The Landings by Lender under Section 3.2 of the Loan Agreement. Certain Requests for Advances were made by The Landings during a period from November, 2006 and continuing through August 2007, and Lender made such Advances pursuant to Section 3.2 of the Loan Documents, which aggregated over $1.1 million during this time frame. Section 4.2 of the Loan Agreement provides that each and every Representation and Warranty set forth in Article 4 of the Loan Agreement were true and correct, *and remade*, upon each and every Advance made by Lender to The Landings. In turn, the following Representations and Warranties in Sections 4.1.1, 4.1.2, 4.1.3, 4.1.4, 5.1.6, and 5.1.7 of the Loan Agreement were false, constituting fraud

-9-

and material misrepresentations, as of the request for the funding of certain of these Advances: (i) Section 4.1.1(b), in which The Landings represented and warranted that the title to the Property was free and clear of "any lien, claim, restriction, security interest or encumbrance"; (ii) Section 4.1.1(g), in which The Landings represented and warranted that all improvements to the Property had been paid for; (iii) Section 4.1.2(f), in which The Landings represented and warranted that The Landings was not in default of any agreement it was a party to; (iv) Section 4.1.2(k), in which The Landings represented and warranted that no material adverse change had occurred in the operations or financial condition of The Landings since the last financial statements of The Landings had been delivered to Lender; (v) Section 4.1.2(p), in which The Landings represented and warranted that The Landings did not intend to incur debts and liabilities beyond its ability to pay as they matured; (vi) Section 4.1.3(d), in which The Landings represented and warranted that to The Landings' knowledge, no information in the Loan Agreement or any written statement furnished by the Landings or on its behalf contained any untrue statements or omissions of material fact, that no facts, circumstances or events existed which would make any information related to or set forth in the Loan Documents inaccurate, incomplete, or misleading, or which otherwise could have a "Material Adverse Effect" under the Loan Documents, and that to the Landings' knowledge it had disclosed to Lender all material facts and had not failed to disclose any material fact that would cause any representation or warranty made in the Loan Agreement to be materially misleading; and (vii) Section 4.1.4, in which The Landings represented and warranted that no "Hazardous Substances" existed on the Property (which defined term includes mold), when mold growth, in fact, existed in a number of apartment units comprising the Property.

27. Further, pursuant to Sections 5.1.6 and 5.1.7 of the Loan Agreement, The Landings covenanted and agreed that: (i) under Section 5.1.6(a)(ii)(B) no Transfers, other than those

Permitted Transfers under the Loan Agreement, had occurred (which said Transfers occurred by virtue of the Liens); and (ii) under Section 5.1.7(n), The Landings would not incur any debts payable in the ordinary course of business of not more than $200,000 in the aggregate, and not more than 60 days past due. Furthermore, pursuant to Section 7.1(m) of the Loan Agreement, The Landings also covenanted and agreed that an Event of Default will have occurred if The Landings failed ". . . to pay any debt owed by it or is in default under any agreement with . . . any other party. . .", other than for liabilities not exceeding $100,000.00.

28.  In making the Advances, the Lender relied upon The Landings' remaking of such representations and warranties, and its continuing covenants and agreements, that all representations and warranties were true and correct, and each covenant and agreement had not been breached as of each Advance. If the Lender had known or been informed that any of the representations or warranties, or covenants and agreements, were not true and correct, or had been breached, then the Lender would not have funded the applicable Advance.

29.  Further, by virtue of Section 5(b) of the First Amendment, executed in May, 2007, The Landings, Nathan, and CVI specifically represented that "There is currently no Event of Default or event which with notice or the passage of time or both would become an Event of Default under the Note, the Mortgage, the Loan Agreement or the other Loan Documents". *See* Exhibit D hereto, §5(b). However, the existence of the Liens prior to the execution of the First Amendment and thereafter, the existence of the breaches of Representations and Warranties, as well as the covenants and agreements, and material misrepresentations and fraud, all identified above, together with the incurrence by The Landings of debt and financial obligations in violation of the terms and provisions of the Loan Documents, (all of which occurred prior to May, 2007), constituted Events of Default existing under the Loan Documents as of execution of the First Amendment, or events which with notice or the passage of time or both would become

Events of Default, such that The Landings, Nathan, and CVI all committed fraud and made material misrepresentations as of execution of the First Amendment by failure to disclose same. In executing and entering into the First Amendment, the Lender relied upon the foregoing representations of The Landings, Nathan and CVI. Without such representations, the Lender would not have entered into the First Amendment or agreed to the transactions and actions contemplated by the First Amendment.

30. Accordingly, based upon and on account of the foregoing events and circumstances, and the fraud and material misrepresentations outlined above, Nathan is personally liable under §1(b)(i) of the Carveout Guaranty for all Indebtedness and Obligations (including Losses and Expenses), which includes, but is not limited to, the Deficiency Amount.

**2. Section 1(b)(ii)**

31. Further, Section 1(b)(ii) of the Carveout Guaranty states, in pertinent part, that "Guarantor agrees to be personally liable for the payment and satisfaction of . . . (b) All of the Indebtedness and other Obligations (including Losses and Expenses) in the event of. . . (ii) any Transfer, sale, conveyance, assignment, further encumbrance, other transfer or the creation of a security interest, by Borrower of title to, or an ownership interest in, the Property or any other Collateral…unless expressly permitted by the Loan Documents."

32. The Loan Documents do not permit, and actually expressly prohibit, the filing of the Liens against the Property. *See* Section 5.1.6(c) of the Loan Agreement.

33. Accordingly, and based upon the foregoing events and circumstances, an event under §1(b)(ii) of the Carveout Guaranty occurred by virtue of the existence of the Liens being filed against the Property, which Liens constituted prohibited transfers of interests in, and further encumbrances on, the Property, resulting in Nathan's personal liability under the Carveout

Guaranty for all Indebtedness and Obligations (including Losses and Expenses), which includes, but is not limited to, the Deficiency Amount.

**3. Section 1(b)(iii)**

34. In addition, Section 1(b)(iii) of the Carveout Guaranty states, in pertinent part, that "Guarantor agrees to be personally liable for the payment and satisfaction of . . . (b) All of the Indebtedness and other Obligations (including Losses and Expenses) in the event of. . . (iii) any acquisition of assets or incurrence of indebtedness by [The Landings] in violation of any provision of the Loan Documents . . . ."

35. Under and pursuant to Section 5.1.7(n) of the Loan Agreement, The Landings covenanted and agreed that it shall "not incur any debts or financial obligations other than the Obligations and normal accounts payable in the ordinary course of business of not more than $200,000 in the aggregate and which are not more than sixty (60) days past due." The aggregate amount of debts and financial obligations evidenced by the Liens is $399,997.13, and, upon information and belief, the same had become more than sixty (60) days past due.

36. Accordingly, and based upon the foregoing events and circumstances, an event under §1(b)(iii) of the Carveout Guaranty occurred by virtue of the Liens being filed against the Property, and the incurrence of the indebtedness underlying such Liens, all of which constituted an incurrence of indebtedness against the Property prohibited by the Loan Documents, resulting in Nathan's personal liability for all Indebtedness and Obligations (including Losses and Expenses), which includes, but is not limited to, the Deficiency Amount.

### LIABILITY UNDER SECTION 1(a) OF CARVEOUT GUARANTY

37. By permitting the Liens against the Property, Nathan also is liable for all of the Losses and Expenses due Lender under the Carveout Guaranty by virtue of the occurrence of events and circumstances identified in §1(a) of the Carveout Guaranty.

**1. Section 1(a)(viii)**

38. Section 1(a)(viii) of the Carveout Guaranty states that "Guarantor agrees to be personally liable for the payment and satisfaction of . . . all Losses and Expenses arising from . . . any failure to pay charges for labor or materials or other charges that could result in the creation of Liens on any portion of the Property."

39. Accordingly, and based upon the foregoing events and circumstances, an event under §1(a)(viii) of the Carveout Guaranty occurred by virtue of the Liens being filed against the Property and the failure to pay the underlying financial obligations, resulting in Nathan's personal liability under the Carveout Guaranty for all Losses and Expenses suffered or incurred by Lender.

**2. Section 1(a)(i)**

40. Section 1(a)(i) of the Carveout Guaranty states that "Guarantor agrees to be personally liable for the payment and satisfaction of . . . all Losses and Expenses arising from . . . any gross negligence or willful misconduct of [The Landings] or any Guarantor . . . ."

41. The Liens arose from The Landings', and/or Nathan's, and/or CVI's gross negligence or willful misconduct in failing to pay suppliers of materials and/or services to the Property, resulting in the foregoing Liens. Accordingly, and based upon the foregoing events and circumstances, an event under §1(a)(viii) of the Carveout Guaranty occurred by virtue of the Liens being filed against the Property, which constituted gross negligence and willful misconduct thereunder, resulting in Nathan's personal liability under the Carveout Guaranty for all Losses and Expenses suffered or incurred by Lender.

**3. SECTION 1(a)(xii)**

42. Section 1(a)(xii) of the Carveout Guaranty states that "Guarantor agrees to be personally liable for the payment and satisfaction of . . . all Losses and Expenses arising from . . .

-14-

any physical loss or damage affecting the Property resulting from the intentional acts of [The Landings] or its agents, or any physical or economic waste with respect to the Property or any part thereof. . . ."

43. The Liens constitute economic waste as to the Property. Accordingly, and based upon the foregoing events and circumstances, an event under §1(a)(xii) of the Carveout Guaranty occurred by virtue of the Liens being filed against the Property, which constituted intentional acts and economic waste with respect to the Property, resulting in Nathan's personal liability under the Carveout Guaranty for all Losses and Expenses suffered or incurred by Lender.

44. Lender has performed all of its duties and obligations under the Carveout Guaranty and other Loan Documents, and has been damaged by the violations described herein.

**WHEREFORE**, Plaintiff ORIX Capital Markets, LLC, respectfully requests the following relief as to Count I of the Complaint:

(A) This Court enter judgment in favor of ORIX and against Defendant Richard J. Nathan for all of Lender's Indebtedness and other Obligations, including Losses and Expenses, pursuant to Nathan's personal liability under the Carveout Guaranty arising from violations of Sections 1(b)(i), (ii) and (iii) thereof, in an amount no less than $5,687,732.37, together with interest at the Default Rate on all of the foregoing until repayment in full to Lender; and

(B) This Court enter judgment in favor of ORIX and against Defendant Richard J. Nathan for all of Lender's Losses and Expenses pursuant to Nathan's personal liability under the Carveout Guaranty arising from violations of Sections 1(a)(i), (viii), and (xii) thereof, together with interest at the Default Rate on the Losses and Expenses until repayment in full to Lender, in an amount to be determined at trial, but in no event less than $75,000; and

(C) Any other and further relief this Court deems to be just and proper.

## COUNT II
### BREACH OF ENVIRONMENTAL INDEMNITY

45. For paragraphs 1-45 of Count II of this Complaint, ORIX hereby restates paragraphs 1 - 44 of this Complaint as is fully set forth herein.

46. By virtue of Section 2 of the Environmental Indemnity, Nathan agreed to indemnify and hold Lender harmless for, *inter alia,* any losses, damages, and costs and expenses, including reasonable attorney's fees and costs, directly or indirectly arising out of or attributable in whole or part to the presence of a Hazardous Substance on, under or about the Property (collectively referred to in the Environmental Indemnity as the "*Indemnity Obligations*"). Said Indemnity Obligations include, without limitation, ". . . (ii) all foreseeable and unforeseeable damages including consequential damages; (ii) the costs of any required or necessary repair, cleanup or detoxification of the Property; (iii) the preparation and implementation of any closure, remedial or other required plans; and (iv) any diminution in value to the Property caused by the presence or release of any Hazardous Substance." *(Id.)*

47. After notice of the Events of Default were served upon Nathan, Lender's inspection of the Property revealed extensive mold infestation and growth in a number of the apartment units comprising the Property.

48. Mold is specifically included in the definition of a Hazardous Substance at Schedule 1.2 of the Loan Agreement.

49. Upon discovery of the mold, Lender undertook an analysis and remediation of the mold infestation, and has currently incurred costs and expenses equal to approximately $61,000.00.

50. Nathan is personally liable for all of these environmental costs and expenses pursuant to the Environmental Indemnity.

51. Lender has complied with all of its duties and obligations under the Environmental Indemnity.

**WHEREFORE,** Plaintiff ORIX Capital Markets, LLC respectfully requests that judgment be entered in its favor and against Defendant Richard J. Nathan on Count II of the Complaint, in an amount to be proven at trial, but in no event less than $61,000.00, plus any additional costs and expenses incurred by ORIX, together with ORIX's costs and attorney's fees and any other and further relief this Court deems to be just and proper.

ORIX CAPITAL MARKETS, LLC

By /s/ David T.B. Audley
One of Its Attorneys

David T.B. Audley
Joseph P. Lombardo
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
(312) 845-3000

Case: 1:08-cv-00929 Document 1:58 Filed: 02/25/2008 Page: 17 of 17