**08 C 1129**

**JUDGE NORGLE**
**MAGISTRATE JUDGE ASHMAN**

# Exhibit B

Bristol Court

# LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** (this "**Agreement**"), which is dated as of February 28, 2006, is by and between Borrower and Lender, as those terms are defined below, who, in consideration of the mutual covenants, conditions and agreements herein contained, agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    **Parties and Basic Terms.**  The terms set forth below, as used in this Agreement, shall have the meanings given them in this Section.

### 1.1.1    **Borrower and Guarantor(s).**

(a)    "**Borrower**" means:  The Landings Florida, LLC, a Florida limited liability company.

(b)    "**Borrower's Address**" means:  c/o Commercial Ventures, Inc., 12100 Wilshire Blvd., Suite 250, Los Angeles, CA 90025, Attn:  Richard Nathan and Greg Beach. Facsimile No.: (310) 207-8497.

(c)    "**Borrower's Counsel**" means:  Shumaker Steckbauer Weinhart, Brian Weinhart.

(d)    "**Borrower's Counsel's Address**" means:  333 S. Hope Street, 36th Floor, Los Angeles, CA 90071, Attn:  Brian Weinhart, Facsimile No.:  (213) 229-2870.

(e)    "**Guarantors**" means:  Collectively, Commercial Ventures, Inc., a Delaware corporation ("**CVI**"), and Richard J. Nathan, individually, each, a "**Guarantor**".

### 1.1.2    **The Lender.**

(a)    "**Lender**" means:  ORIX Real Estate Capital, Inc. and its successors and assigns.

(b)    "**Lender's Address**" means:  100 North Riverside Plaza, Suite 1400, Chicago, Illinois 60606.  Facsimile No. (312) 669-6464.

(c)    "**Lender's Counsel**" means:  Gardner Carton & Douglas LLP, Michael E. Mermall, Esq.

(d)    "**Lender's Counsel's Address**" means:  191 N. Wacker Drive, Suite 3700, Chicago, Illinois 60606.  Facsimile No.:  (312) 569-3448.

### 1.1.3   The Property.

(a)    "**Improvements**" include the following:  a 440 unit apartment complex containing a total of approximately 381,496 rentable square feet, commonly known as Bristol Court Apartments, as more defined in Schedule 1.2.

(b)    "**Land**" means:  The approximately 39.434 acre parcel of land having a common address of 3655 Westchase Village Lane, Norcross, Georgia  30092 and being legally described on attached Exhibit A.

(c)    "**Project**" means:  The acquisition, renovation and re-tenanting of the Property.

### 1.1.4   The Loan.

(a)    "**CapEx Holdback**" means:  A holdback from the proceeds of the Loan in the amount of $2,000,000.

(b)    "**CapEx Reserve**" means a reserve account established by and under the control of Lender pursuant to Section 2.6.

(c)    "**Commitment Fee**" means: $265,000.

(d)    "**Default Rate**" means:  The per annum rate equal to the Interest Rate plus 500 Basis Points.

(e)    "**Exit Fee**" means:  (a) if the Loan becomes due during the Lockout Period by reason of an acceleration of the Maturity Date following an Event of Default, one percent (1%) of the Loan Amount plus the interest thereon which would be payable during the Lockout Period (determined based on the Interest Rate in effect at the time of such Event of Default) less interest actually paid during the Lockout Period, (b) if a portion of the Loan Amount is prepaid after the Lockout Period, one percent (1%) of the amount prepaid and (c) if the Loan is paid in full after the Lockout Period, whether by prepayment or upon maturity, one percent (1%) of the Loan Amount less any portion thereof paid in connection with any previous prepayments.

(f)    "**Fire Damage Reserve**" means a reserve account established by and under the control of Lender pursuant to Section 2.7.

(g)    "**Holdbacks**" means:  Collectively, the Interest Holdback and the CapEx Holdback, each a "**Holdback**".

(h)    "**Initial Disbursement**" means:  Up to $24,100,000, provided that the actual Initial Disbursement will be determined by Lender based upon the Loan Budget and approved closing costs and disbursements.

(i)    "**Interest Holdback**" means:  A holdback from the proceeds of the Loan in the amount of $400,000.

(j)    **"Interest Rate"** means:  A per annum rate equal to LIBOR plus 350 Basis Points.  The Interest Rate shall be adjusted on the first day of each calendar month based upon LIBOR in effect on the second to last Business Day of the preceding month, except that if the last day of such month is a day on which the Wall Street Journal is not published or a day on which LIBOR is not published in the Wall Street Journal, then LIBOR for that month shall be LIBOR as published on the immediately preceding day on which the Wall Street Journal is published, provided that if the Wall Street Journal is no longer available as a source for determination of LIBOR, LIBOR will be determined from another readily available source selected by Lender in its sole discretion.  In the event that no LIBOR shall be published, Lender (in its sole discretion) may substitute another rate approximating the LIBOR (which substitute rate may be reasonably adjusted by Lender) to the effect that such substitute rate will provide for an interest rate equivalent to the Interest Rate which would have been effective if the LIBOR were quoted, as determined by Lender (in its sole discretion).

(k)    **"Loan Amount"** means: $26,500,000.

(l)    **"Loan Budget"** means:  The sources and uses of the Loan Amount set forth on <u>Exhibit B</u>.

(m)    **"Lockout Period"** means:  The period commencing on the Closing Date and ending on the first anniversary of the Closing Date.

(n)    **"Maturity Date"** means:  February 27, 2009.

(o)    **"Retaining Wall Reserve"** means a reserve account established by and under the control of Lender pursuant to <u>Section 2.8</u>.

### 1.1.5    <u>Third Parties</u>.

(a)    **"Broker"** means:  Charter Capital.

(b)    **"Property Manager"** means:   GREP Southeast, LLC-Management Series, a Delaware limited liability company, and any successor Property Manager approved by Lender, which approval will not be unreasonably withheld.

(c)    **"Property Manager's Address"** means:  4511 North Himes Avenue, Suite 245, Tampa, FL 33614.

(d)    **"Management Agreement"** means:  That certain Property Management Agreement dated February 28, 2006 between Borrower and Property Manager, and any successor management agreement approved by Lender.

(e)    **"Title Company"** means:  Chicago Title Insurance Company, 700 S. Flower Street, Suite 800, Los Angeles, CA 90017, Attn:  Lizeth Villalobos.

### 1.1.6    <u>Leasing</u>.

(a)  **"Residential Lease"** means any proposed residential Lease that (i) is on a form previously approved by Lender, (ii) demises less than five (5) residential units of the Property to a single individual or entity, (iii) has a term of not greater than one (1) year with no extension rights, (iv) is at no less than market rental rates, as determined by Lender, and (v) does not grant the tenant any purchase option or right of first refusal to purchase all or any portion of the Property or otherwise contain terms that would cause a material impairment of Lender's security.

1.2  **Additional Definitions.**  Schedule 1.2 attached to this Agreement sets forth additional defined terms and such terms are hereby incorporated in this Agreement and expressly made a part of this Agreement by this reference.

## ARTICLE 2
## TERMS OF THE LOAN

2.1  **Agreement to Lend and Borrow.**  Subject to and upon the terms and conditions set forth in this Agreement, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender, from time to time, such sums as may be requested by Borrower, the total of which shall not exceed the Loan Amount to be used, as provided in this Agreement in conformance with the Loan Budget.

2.2  **Loan Disbursements.**

2.2.1  **Initial Disbursement.**  Upon satisfaction of all applicable conditions set forth in Section 3.1, Lender will make an advance of the Loan in the amount of up to the Initial Disbursement.  The actual amount of the Initial Disbursement shall be determined by Lender based on the Loan Budget.  Borrower shall give Lender not less than two (2) Business Days prior written notice of the date Borrower desires to receive the Initial Disbursement.

2.2.2  **Holdbacks.**  The Holdbacks shall be available for disbursement upon satisfaction of the applicable terms and conditions of this Agreement.  Advances from each of the Holdbacks shall not exceed the amount of the applicable Holdback as set forth in Section 1.1 of this Agreement.

(a)  Lender shall make Advances to itself solely for the payment of Accrued Interest from the Interest Holdback in an amount equal to the Monthly Interest Deficiency.

(b)  Lender shall make Advances of the CapEx Holdback solely to pay for Approved CapEx Expenses, and only to the extent there are not sufficient funds in the CapEx Reserve.

2.3  **Payments.**

2.3.1  **Interest and Principal.**

(a)  The principal balance of the Loan shall bear interest at the Interest Rate or, as applicable, the Default Rate.  Interest shall accrue on the principal balance of the Loan, from time to time, based on a 360 day year and charged for the actual number of days outstanding.

Commencing on the first Scheduled Payment Date, and on or before each Scheduled Payment Date thereafter, Borrower shall pay, in arrears, all Accrued Interest.

(b)  Borrower shall pay all Indebtedness, including the entire outstanding principal balance of the Loan, all Accrued Interest and the Exit Fee on the Maturity Date.

(c)  Following the occurrence of an Event of Default, interest shall be computed at, and Borrower shall pay interest on the unpaid principal balance of the Loan at, the Default Rate until such Event of Default has been cured to Lender's satisfaction. All other payments, reimbursements and other amounts due from Borrower to Lender under the Loan Documents not paid when due shall bear interest at the Default Rate from the date when due until the date when received by Lender.  Acceptance by Lender and payment by Borrower at the Default Rate is not a permitted alternative to the full and timely payment of all amounts due and payable under the Loan Documents and shall not limit or prejudice Lender's rights and remedies for non-payment.

(d)  At any time after the expiration of the Lockout Period, upon not less than thirty (30) days prior written notice to Lender, Borrower may prepay the Loan in whole or in part, provided that (1) if the principal amount is being prepaid in part, Borrower shall also pay the proportionate amount of the Exit Fee and (2) upon any payment of the entire principal balance of the Loan, all other Indebtedness, including all Accrued Interest and the Exit Fee shall also be paid in full.  Such notice shall specify the amount to be prepaid and the date on which such prepayment shall occur.  All prepayments (other than mandatory prepayments or a payment of the entire Loan balance) shall be in increments of $25,000.

(e)  Lease termination fees payments shall be paid to Lender and held in the CapEx Reserve.

(f)  Unless otherwise specified in this Agreement, all amounts payable to Lender shall be due and payable within ten (10) days after written request or invoice.

2.3.2  **Application of Payments.**  Except as otherwise specifically set forth in this Agreement, all payments shall be applied to the Indebtedness in such order, priority and manner as Lender may elect.

2.3.3  **Place and Manner of Payment.**  The payment of all amounts due under this Agreement and the other Loan Documents shall be deemed received only when actually received by Lender in Dallas, Texas and, if Lender so elects, shall be made by ACH from the Blocked Account or other depository account approved.  Payments received after 1:00 p.m. in said location shall be deemed received on the next day Lender is open for business. At Lender's option, Lender may accept payments by check or in form other than immediately available funds, but such payments shall be accepted subject to collection and, at Lender's option, shall be deemed received only when collected.  Acceptance by Lender of payments in other than immediately available funds or by ACH shall not constitute a waiver by Lender of its rights to insist that any subsequent payment be made in immediately available funds or by ACH. All amounts due from Borrower or any Borrower Party under the Loan Documents shall be payable without setoff, counterclaim or any other deduction whatsoever.

**2.3.4 Late Payment Fee.** If any payment due on any Scheduled Payment Date or any other amount due hereunder (other than the principal amount due on the Maturity Date) is not made within ten (10) days of the Scheduled Payment Date, or, as applicable, ten (10) days (or such earlier time as may be specified herein) after request for payment by Lender, Lender, at its option and in addition to any other remedy available to Lender, may impose a late payment fee, which Borrower covenants to pay upon demand calculated at the rate of five percent (5%) of the amount of such delinquent payment or deposit. Without limiting the foregoing, any late payment fee shall be paid without prejudice to the right of Lender to collect any other amounts provided to be paid upon an Event of Default, including without limitation any other amounts due at the Default Rate, or to declare a default hereunder under any of the other Loan Documents.

## 2.4 Legal Interest.

**2.4.1 Savings.** In the event the interest (including without limitation, at the Default Rate) or other payments required to be made under the Loan Documents or otherwise, shall at any time exceed the Legal Limits, all such sums paid by Borrower or any guarantor(s) or indemnitor(s) for the period in question that exceed the Legal Limits, automatically and without further documentation or action by Borrower, any guarantor(s) or indemnitor(s) or Lender, shall be applied to the Indebtedness, in such order and manner as Lender may elect, but only to the extent that it does not violate the Legal Limits, or if the Indebtedness has been repaid in full and Borrower and Guarantors have performed and satisfied all of the other Obligations, then such excess shall be refunded to Borrower. In no event whatsoever shall the amount of interest paid or agreed to be paid to Lender pursuant to this Loan Agreement, the Note or any of the Loan Documents exceed the Legal Limits. Neither Borrower nor any guarantor, endorser or surety nor their heirs, legal representatives, successors or assigns shall have any action against Lender for any damages whatsoever arising out of the payment or collection of any amounts that exceed the Legal Limits, and all such claims and causes of action are hereby indefeasibly waived and released.

**2.4.2 Default Interest.** Borrower acknowledges that the occurrence of any Event of Default will (a) require Lender to incur additional expense in servicing and administering the Loan, and (b) result in loss to Lender of the use of the money due and impede Lender in meeting its other financial and loan commitments. Borrower further acknowledges that the damages caused thereby will be extremely difficult and impractical to ascertain. Accordingly, Borrower agrees that any late payment fee imposed on Borrower under this Agreement represents the reasonable estimate of Lender and Borrower of a fair compensation for the loss that may be sustained by Lender due to the failure of Borrower to make timely payments, and that the accrual of interest at the Default Rate is a reasonable estimate of the damage to Lender in the event of such default, regardless of whether there has been acceleration of the Indebtedness.

## 2.5 Deposits and Reserves.

**2.5.1 Tax and Insurance Deposits.** On or before the Closing Date Borrower shall (a) pay all Impositions and Premiums then due and payable or due and payable within thirty (30) days after the Closing Date and (b) deposit with Lender an amount sufficient,

when added to the Monthly Tax Deposits and Monthly Insurance Deposits to be collected prior to the dates when Impositions and Premiums next become due and payable, to pay such Impositions and Premiums no less than thirty (30) days in advance. On each Scheduled Payment Date, Borrower shall deposit with Lender the Monthly Tax Deposit and the Monthly Insurance Deposit.

2.5.2 **Holding of Deposits, Security Interest**. All Deposits may be commingled with other funds of Lender, except as specifically provided in this Agreement. Lender shall cause the Deposits to be held by a depository designated by Lender in one or more interest bearing accounts (with such interest being for the benefit of Borrower, provided Lender does not guarantee any specific interest rate or return). A security interest within the meaning of the Code is hereby granted to Lender in and to all Deposits and all of Borrower's right, title and interest therein are hereby assigned to Lender, all as additional security for the Indebtedness and shall not be subject to the direction or control of Borrower. Lender shall not be liable for any failure to apply any Deposit, in the absence of gross negligence or willful misconduct of Lender. Lender shall not be liable for any act or omission taken in good faith or pursuant to the instruction of any party. In the event of an Event of Default, Lender may at its option, without being required to do so, apply any portion of the Deposits, other than unforfeited tenant security deposits, to pay Indebtedness, including Charges, in such order and manner as Lender may elect. To the extent Deposits are used to pay Indebtedness, Borrower shall immediately upon demand by Lender, deposit with Lender an amount equal to the amount so used.

2.5.3 **Use of Deposits**. Provided no Event of Default then exists, the Monthly Tax Deposits and the Monthly Insurance Deposits will be used for the payment of the Impositions and Premiums next due and payable when they become due. Upon demand by Lender, Borrower shall deliver and pay over to Lender from time to time such additional sums or such additional security as are necessary to make up any deficiency in the amount necessary, as reasonably determined by Lender, to enable Lender to fully pay the Impositions and Premiums as they become due and payable. If the funds so deposited exceed the amount required to pay Impositions and Premiums for any year, the excess shall be applied to subsequent Monthly Tax Deposits, as reasonably determined by Lender. Provided that no Default or Event of Default then exists and all applicable conditions set forth in Section 3.2 have been satisfied, Borrower, at its option, may request (and Lender shall disburse) an Advance from the CapEx Reserve to pay for Approved CapEx Expenses.

2.6 **Blocked Account**. Borrower will cause all Revenues to be deposited to the Blocked Account and shall give irrevocable notices to tenants and other account debtors of Borrower or the Property to make all payments, if made by wire transfer, directly to the Blocked Account. Borrower will disburse funds from the Blocked Account (by ACH or otherwise) in the following order of priority:

(a)     First, to pay any unpaid Charges;

(b)     next, to pay all Accrued Interest then due and payable except if there are undisbursed amounts in the Interest Holdback, Revenues shall be applied first to the items described in subsections (c) and (d) below and then to Accrued Interest;

(c)     next, to Lender to make the required amount of the (Monthly Tax Deposits and the Monthly Insurance Deposit);

(d)     next, to pay Eligible Expenses; and

(e)     finally, the Revenues remaining after the payments described in (a), (b), (c) and (d) above shall be paid to Lender and deposited into the CapEx Reserve.

The amounts described in clauses (a), (b), (c) and (d) shall be due and payable on each Scheduled Payment Date whether or not Revenues or the Interest Holdback are sufficient therefor. Notwithstanding anything contained in this Section 2.6 to the contrary, provided that there are Revenues remaining after having made the payments described in clauses (a), (b), (c) and (d) above, and so long as (i) No Default or Event of Default shall have occurred and be continuing, (ii) the Project Yield is at least eight and one-half percent (8.5%), and (iii) Net Operating Income is equal to or greater than the product obtained by multiplying the Debt Service by 1.10, then, prior to any payment into the CapEx Reserve pursuant to clause (e) above, an amount not to exceed one-twelfth (1/12) of the product obtained by multiplying 0.085 by $3,965,000 shall be paid to Borrower not more than once in any thirty (30) day period (the "**Borrower Return**").

2.7     **Fire Damage Reserve**. On the Closing Date, Borrower shall deposit with Lender an amount equal to $50,000 to be held in the Fire Damage Reserve. Provided that no Default or Event of Default then exists and all applicable conditions set forth in Sections 3.2 and 5.2.6 have been satisfied, Borrower, at its option, may request (and Lender shall disburse) an Advance from the Fire Damage Reserve to pay for approved Fire Damage Repairs.

2.8     **Retaining Wall Reserve**. On the Closing Date, Borrower shall deposit with Lender an amount equal to $200,000 to be held in the Retaining Wall Reserve. Provided that no Default or Event of Default then exists and all applicable conditions set forth in Sections 3.2 and 5.2.6 have been satisfied, Borrower, at its option, may request (and Lender shall disburse) an Advance from the Retaining Wall Reserve to pay for approved Retaining Wall Work.

# ARTICLE 3
# CONDITIONS TO DISBURSEMENTS

3.1     **Conditions to Initial Disbursement**. Lender's obligation to close the Loan and make the Initial Disbursement is conditioned upon Borrower's and Guarantors' execution, delivery and performance, as applicable, each in form and substance satisfactory to Lender in its sole discretion, of the following:

3.1.1     **Checklist**. All items set forth on the Closing Checklist, as the same may be amended from time to time.

3.1.2     **Loan Documents**. Originals of such promissory notes, mortgages, deeds of trust, guaranties, pledges and other Loan Documents as Lender shall require shall have been executed and delivered to Lender.

CH01/ 12462729.7

3.1.3 **Completion of Purchase.** Evidence that Borrower has completed the acquisition of the Property shall have been delivered to Lender.

3.1.4 **Commitment Fee.** Borrower shall have paid Lender the Commitment Fee.

3.1.5 **Title.** The Title Policy, in form satisfactory to Lender shall have been issued to Lender.

3.1.6 **Survey.** Lender shall have received a current Survey.

3.1.7 **Insurance.** Lender shall have received evidence of compliance with the insurance requirements of the Loan Documents and evidence of the payment of all Premiums then due and payable for the then current policy period.

3.1.8 **Environmental Reports.** Lender shall have received a copy of the Environmental Site Assessment and any other Environmental Report required by Lender.

3.1.9 **Zoning.** Lender shall have received a Property Zoning Report prepared by The Planning and Zoning Resource Corporation or a similar research firm approved by Lender, letters or other evidence with respect to the Property from the appropriate Governmental Authority concerning compliance with building codes and zoning laws, if available, and the Title Policy shall have an ALTA 3.1 zoning endorsement, with coverage for parking.

3.1.10 **Engineering Reports.** Lender shall have received Engineering Reports.

3.1.11 **Lien Search Reports.** Lender shall have received search reports satisfactory to it with respect to uniform commercial code financing statements, tax liens, judgments, the OFAC lists and criminal backgrounds of all individual Guarantors or controlling owners of Borrower conducted by a search firm or firms acceptable to Lender with respect to the Property and, as applicable, each Borrower Party in such jurisdictions as Lender shall have reasonably requested.

3.1.12 **Authority.** Borrower shall have delivered or caused to be delivered to Lender copies, certified by an officer or other authorized Person of the applicable Borrower Party of: (i) all such Organizational Documents related to each Borrower Party, which is an entity in each case together with each amendment thereto and certified (as of a date reasonably near the Closing Date) by the applicable Secretary of State as being a true and correct copy; (ii) a certificate of the Secretary of State of the jurisdiction of each Borrower Party's formation (dated reasonably near the Closing Date), certifying that each Borrower Party is duly formed and in good standing under the laws of the State of the jurisdiction of its respective organization; (iii) a certificate of the Secretary of State of the State in which the Property is located (dated reasonably near the Closing Date), stating that each Borrower Party is duly qualified and in good standing in such State; (iv) a certificate of Borrower signed by a duly authorized officer or other authorized Person (dated as of the Closing Date), certifying (A) as to the truth of the representations and warranties in all material respects contained in the Loan

Documents to which such parties are a party, both before and after giving effect to the making of the Loan by Lender and to the application of the proceeds therefrom and (B) that to Borrower's Knowledge, no material event has occurred and is then continuing, or would result from the making of the Loan by Lender or from the application of the proceeds therefrom, that constitutes or would constitute an Event of Default; (v) a certified copy of the resolutions of each Borrower Party which is an entity approving the Loan, this Agreement, the Note and each of the other Loan Documents to which such Borrower Party is or is to be a party, and of all documents evidencing other necessary partnership, limited liability company or corporate action and governmental and other third party approvals and consents, if any, with respect to the Loan, this Agreement, the Note and each other Loan Document; and (vi) a notarized certificate of each of Borrower Party which is an entity certifying the names and true signatures of the Persons authorized to sign this Agreement, the Note and each of the other Loan Documents to which such Borrower Party is or is to be a party and the other documents to be delivered hereunder and thereunder.

3.1.13 **Opinions of Counsel.** Lender shall have received legal opinions from counsel satisfactory to Lender with respect to: (i) the due organization and existence of each Borrower Party; (ii) the due execution, delivery, authority, and enforceability of the Mortgage, this Agreement, the Note, the Environmental Indemnity, the Guaranty and each of the other Loan Documents to which any Borrower Party is a party; (iii) usury; (iv) knowledge of adverse claims or violations of Organizational Documents or material contracts of Borrower Parties which are entities; (v) local filing requirements with respect to perfection; and (vi) such other matters as Lender may reasonably require.

3.1.14 **No Material Adverse Change.** Lender shall be satisfied that, as of the Closing Date, there shall have been no change or development, since February 16, 2006, that has or will have a Material Adverse Effect on Borrower or any Guarantor.

3.1.15 **[Reserved]**

3.1.16 **Appraisal.** Lender shall have received an Appraisal reasonably satisfactory to Lender.

3.1.17 **Financial Statements.** Each Guarantor shall have provided the required financial statements of each Guarantor for the fiscal year to date ending December 31, 2005, all of which statements shall be accompanied by a certificate of the Guarantor (or an officer or authorized representative of any Guarantor which is an entity) certifying that each such financial statement presents fairly in all material respects the financial condition or operating results, as applicable, of such Guarantor and has been prepared in accordance with sound accrual basis accounting practices, which shall be consistently applied.

3.1.18 **No Injunction.** No law or regulation shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending or threatened, which in the good faith judgment of Lender would enjoin, prohibit or restrain, or impose or result in a Material Adverse Effect upon, the making or repayment of the Loan or the consummation of the transactions contemplated hereby.

**3.1.19 <u>Payment of Lender Expenses by the Borrower</u>.** Borrower shall have paid all Charges then due and payable.

**3.1.20 <u>Additional Information</u>.** Lender shall have received such other information and documentation with respect to each Borrower Party and its respective Affiliates, the Property and the transactions contemplated herein as Lender may reasonably request.

**3.1.21 <u>Site Inspections</u>.** Lender shall have performed or caused to be performed on its behalf, on-site due diligence reviews of the Property.

**3.1.22 <u>Borrower's Equity</u>.** Lender shall be satisfied that Borrower's cash equity in the Property is no less than $3,965,000.

**3.1.23 <u>Other Requirements</u>.** Borrower shall have complied with such other closing requirements as Lender shall reasonably impose.

**3.2 <u>Advances</u>.** Advances shall be available upon satisfaction of the following conditions:

**3.2.1 <u>All Advances</u>.** Each Advance shall be subject to satisfaction of each of the following conditions:

(a) Any request for an Advance shall be submitted to Lender on Lender's form of request, not less than ten (10) Business Days prior to the anticipated disbursement date for the Advance, and shall be accompanied by all evidence reasonably required to be approved by Lender as a condition to such Advance, including, with respect to the conditions set forth in clauses (d) and (e) below, a certificate from an officer or authorized representative of Borrower approved by Lender stating that said conditions are then satisfied. No Advance will be made less than sixty (60) days prior to the Maturity Date.

(b) Lender shall not be required to make more than one Advance (which may consist of disbursements of one or more of the Holdbacks) during any calendar month. Each monthly Advance shall be in a minimum amount of $25,000 or, if less, the remaining undisbursed amount of the applicable Holdback.

(c) Lender may, in its reasonable discretion, require an endorsement to the Title Policy, in form and content satisfactory to Lender, insuring, in effect, that such Advance has the same priority as the Initial Disbursement and that there has been no material adverse change in the condition of title to the Property, including the absence of any Lien or exception which is not a Permitted Exception, since the issuance of the Title Policy.

(d) No actions, suits or proceedings shall then be pending nor have any been threatened against or which affect Borrower, any Guarantor or the Property and no event or circumstance shall have occurred which could have a Material Adverse Effect on Borrower or any Guarantor.

(e)     No Default or Event of Default shall have occurred and be continuing and all representations and warranties set forth in this Agreement and in any other Loan Document shall be true and correct.

(f)     All Loan Documents shall be in full force and effect.

(g)     Borrower shall pay Lender a processing fee equal to $300.

### 3.2.2   [Reserved]

### 3.2.3   Advances for Construction Projects.  All Advances from the CapEx Holdback or the CapEx Reserve in respect of a Construction Project shall be subject to the satisfaction, as determined by Lender, of each of the following conditions, in addition to the conditions set forth in Section 3.2.1 above:

(a)     All requirements of Section 5.2.1 and 5.2.3 shall have been satisfied.  All Construction Contracts with respect to such Construction Project shall be in full force and effect, and Lender shall have approved any modifications to the Construction Documents, which approval shall not be unreasonably withheld, conditioned or delayed.

(b)     There shall be no substantial unrepaired damage to the Property by fire or other casualty which is not in Lender's reasonable judgment adequately covered by collectible proceeds of insurance which will be made available to Borrower by Lender for such purpose.

(c)     All permits, licenses and approvals, including, without limitation, all environmental approvals, necessary for Completion of such Construction Project in compliance with the Construction Documents shall have been issued in form and substance reasonably satisfactory to Lender.

(d)     All utilities and municipal services, including, without limitation, storm and sanitary sewers, required for such Construction Project shall be available at the Property and Borrower shall have the right to tie into such utilities and municipal services.

(e)     Advances in connection with any Construction Project shall be subject to contractor retainages of ten percent (10%) of the value of work performed, as reasonably determined by Lender.

(f)     The Construction Project, when completed in accordance with applicable Construction Documents, will be in compliance with all Applicable Laws and all consents or approvals required from third parties or any Governmental Authorities have been obtained or will be obtained prior to the time that such approvals are required.

(g)     Lender's consultant, if applicable, shall have issued a report dated within ten (10) days' prior to any requested Advance to the effect that the Construction Project is in substantial compliance with the Approved Plans and other Construction Documents and that the Construction Project is In Balance.

(h)    All materials for such Construction Project shall have been installed at the Property.

(i)    To the extent that additional permits, approvals or licenses for construction have been issued since the last construction disbursement, copies of such additional permits shall have been delivered to Lender.

(j)    Contractors, subcontractors and materialmen have submitted such sworn statements or affidavits and lien waivers as Lender or the Title Company may require.

(k)    Those Construction Contracts designated by Lender (including subcontracts if the general contractor is an Affiliate of Borrower or any Guarantor) shall have been collaterally assigned to Lender on Lender's form and acknowledged by the applicable contractor.

(l)    [Reserved]

(m)    Borrower shall have obtained or caused its contractors to obtain such insurance and/or dual obligee performance bonds and payment bonds as Lender may reasonably require.

(n)    No Deficiency then exists.

3.2.4    **Completion.**  Upon Completion of each Construction Project, and as a condition to any final Advance or Advance for the payment of retainage requested with respect to such Construction Project, Borrower shall deliver, or cause to be delivered to Lender, the following, each in form and substance satisfactory to Lender:

(a)    Certificates of Lender's consultant, if any, the Architect and the general contractor that such Construction Project is Complete, except that no such certificates will be required for Exempt Projects.

(b)    If the Construction Project affected or altered any matter that would be reflected on a survey, a current survey of the Property, certified by a registered land surveyor, with a certificate in favor of Lender and the Title Company.

(c)    Temporary or permanent certificate(s) of occupancy, or other evidence acceptable to Lender, together with all other appropriate certificates and other documentation that Lender may require from, and as are customarily issued by, applicable Governmental Authorities, evidencing (i) compliance with all Applicable Laws, except for non-compliance which could not have a Material Adverse Effect, and (ii) that no petitions, actions or proceedings are pending or threatened which could reasonably be expected to materially alter or declare invalid any approvals, consents, permits or certificates for or relating to such Construction Project, or any part thereof.

(d)    [Reserved]

CH01/ 12462729.7

-13-

(e)     If required by Lender, current searches of all Uniform Commercial Code financing statements filed with the Secretary of State of Borrower's organization and/or the recorder's office for the county in which the Property is located, against Borrower, as debtor, showing that no unterminated Uniform Commercial Code financing statements are filed or recorded against Borrower.

(f)     Final sworn statements or affidavits and waivers of lien (which may be conditioned upon final payment) from contractors, subcontractors and materialmen as required by Lender or the Title Company.

(g)     Such other items as Lender may reasonably require.

3.2.5  **Payments**.  Lender may, in its sole discretion, make Advances relating to a Construction Project through the Title Company pursuant to a construction loan disbursement escrow agreement or directly to the Contractor, or any subcontractor, material supplier or any vendor of fixtures, equipment, furniture, furnishings and other property. Advances of the Leasing Holdback for reimbursement to tenants for leasehold improvement allowances shall be subject to the provisions of this Section 3.2.

3.2.6  **Waiver and Reallocation**.  Lender may from time to time waive any condition or conditions to any Advances without such waiver or series of waivers constituting a course of dealing or any amendment to this Agreement or a prohibition against subsequent imposition of such condition or conditions or a waiver of any default.  Upon Borrower's request and provided no Deficiency exists, Lender may in its sole discretion, reallocate funds in any Holdback to a different Holdback or to a new holdback or reserve and in connection with any such reallocation the Loan Budget shall be amended accordingly.

3.2.7  **Consultants**.  At Borrower's expense, Lender shall have the right to employ an inspecting architect, engineer or consultant with respect to a Construction Project.

# ARTICLE 4
# REPRESENTATIONS AND WARRANTIES

4.1     **Representations and Warranties**.  Borrower represents and warrants that all statements set forth in this Article 4 are true as of the Closing Date and Borrower covenants that, except for those representations and warranties that relate to a specific date, Borrower shall cause the same to remain true until all Indebtedness has been paid and satisfied in full.

4.1.1  **The Property**.

(a)     The use and occupancy of the Property complies with all Applicable Laws and Operating Agreements, except for matters which, both individually and collectively, do not have a Material Adverse Effect.

(b)     Borrower has good, marketable and indefeasible fee simple title to the Land and Improvements and has good and merchantable title to the other Collateral, and such title and interest is free and clear of any lien, claim, restriction, security interest or encumbrance, other than Permitted Exceptions.

CH01/ 12462729.7                                    -14-

(c)     The Property is comprised of a single tax parcel, or group of contiguous tax parcels, which is or are separate and apart from any property not owned by Borrower, for real estate tax purposes.

(d)     The Property has adequate water, gas and electrical supply, storm and sanitary sewerage facilities, other required public utilities, fire and police protection, and means of access between the Property and public streets, and to Borrower's Knowledge all of the foregoing comply with all Applicable Laws.

(e)     No part of the Property has been taken by the power of eminent domain or condemnation nor is any proceeding for such a taking pending, or to Borrower's Knowledge, threatened.

(f)     To Borrower's Knowledge the Property is not located within an area designated as a "flood plain" or "flood hazard area" according to applicable flood plain and flood control surveys, except as shown on the surveys delivered to Lender.

(g)     Except for Construction Projects approved by Lender which are being conducted pursuant to the terms of this Agreement, to Borrower's Knowledge the Property, including all Improvements, and all grading, seeding and landscaping and all other on-site and off-site improvements have been completed in substantial accordance with all Applicable Laws, and have been fully equipped and paid for and is in good condition, order and repair in all respects material to its current and intended uses and to Borrower's Knowledge, there are no material defects or damage thereto.

(h)     To Borrower's Knowledge, as constructed, the Improvements have been inspected and approved by all necessary municipal authorities, and the Property, including the Improvements, is, to Borrower's Knowledge, in compliance with all Applicable Laws and with all requirements of applicable insurance carriers. Borrower has not received written notice from any insurance company or bonding company of any defects or inadequacies in the Property or any part thereof, which would, alone or in the aggregate, adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(i)     Except for the agreements listed on <u>Exhibit F</u>, the Property is not subject to any Material Agreement. Borrower has delivered to Lender copies of all agreements listed on Exhibit F.

(j)     To Borrower's Knowledge the Rent Roll is true, complete and correct and the Property is not subject to any Leases or other use or occupancy licenses or agreements other than the Leases described in the Rent Roll and which constitute Permitted Exceptions. To Borrower's Knowledge, except as set forth on the Rent Roll: (i) each Lease is in full force and effect; (ii) each tenant under each of the Leases has accepted possession of and is in occupancy of all of its respective demised premises, has commenced the payment of rent under its Lease, and has no offset right, claim or defense to the enforcement of its Lease; (iii) all rents due and payable under the Leases have been paid and (other than security deposits) no portion of such rents has been paid for any period more than 30 days in advance, and the Rent Roll shows any

unamortized free rent or rent abatements, any unused construction allowances and unperformed Landlord construction obligations; (iv) the rent payable under each Lease is the amount of fixed rent set forth in the Rent Roll, and there is no claim or basis for a claim by the tenant thereunder for an adjustment to the rent; (v) to Borrower's Knowledge, no tenant has made any claim against the landlord under any Lease which remains outstanding, there are no defaults on the part of the landlord under any Lease, and no event has occurred which, with the giving of notice or passage of time, or both, would constitute such a default; (vi) to Borrower's Knowledge, there is no present material default by the tenant under any Lease and no notice of termination has been issued under any Lease; (vii) all security deposits under Leases are as set forth on the Rent Roll; (viii) Borrower is the sole owner of the entire lessor's interest in each Lease; (ix) each Lease is the valid, binding and enforceable obligation of the Borrower and the applicable tenant thereunder; (x) no Person has any possessory interest in, or right to occupy, the Property except under the terms of the Lease; (xi) each Lease is subordinate to the Loan Documents, either pursuant to its terms or pursuant to a subordination, non-disturbance and attornment agreement; (vii) none of the Leases contains any option to purchase or right of first refusal to purchase the Property or any part thereof; (xiii) neither the Leases nor the Revenues (or any portion thereof) have been assigned or pledged except to Lender; (xiv) no other Person has any interest in any of the Leases except the landlord and the tenant thereunder; and (xv) no brokerage commissions remain unpaid or will become due and payable with respect to any Lease, including upon any expansion of the premises or any renewal or extension thereof.

(k)     The Operating Budget represents a full, complete, accurate and good faith estimate of all Revenues, Impositions, operating expenses, capital expenditures and reserves relating to the ownership and operation of the Property for the time periods reflected in said Operating Budget.

(l)     With respect to the Property, the Mortgage, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on the Property, subject only to Permitted Exceptions; and (ii) perfected security interests in and to, and perfected collateral assignments of, all personal property of Borrower (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Exceptions.

(m)     The Permitted Exceptions do not and will not materially adversely affect or interfere with: (i) the value, or intended use or operation, of the Property; (ii) the security intended to be provided by the Mortgage; (iii) Borrower's ability to repay the Note; or (iv) Borrower's ability to perform its obligations under any other Loan Document in accordance with the terms of the Loan Documents. Except as indicated in and insured over by the Title Policy, to Borrower's Knowledge there are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents (other than mechanics or materialmens liens for work or materials performed or supplied the costs for which are not yet past due or which are being contested in a manner permitted by this Agreement. Nothing in this Section 4.1.1 may be relied on by the Title Company issuing any policies covering the Property. No Person other than Borrower owns any interest in any payments due under the Leases that is superior to or of equal priority with Lender's interest therein.

(n)     All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under Applicable Laws have been paid in full or deposited with the Title Company for payment upon recordation of the deeds effecting such transfer. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under Applicable Laws in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Mortgage, and the Liens intended to be created thereby, have been paid or will be deposited with a the Title Company for payment upon recordation of the Mortgage.

(o)     Borrower has delivered to Lender true and complete copies of all agreements and other instruments under which it or any of its Affiliates or any other Person have rights or obligations in respect of Borrower's acquisition or lease of the Property other than with respect to obligations (i) that may be incurred but are chargeable to the seller of the Property and not to Borrower and (ii) for which Borrower has been indemnified by the seller of the Property.

(p)     To Borrower's Knowledge there are no pending or proposed special or other assessments for public improvements or other matters affecting the Property, nor, to Borrower's Knowledge, are there any contemplated improvements to the Property that are likely to result in such special or other assessments.

### 4.1.2  Ownership Structure, Power and Authority.

(a)     All of the information regarding Borrower set forth in Section 1.1.1 of this Agreement is true and correct. Borrower is duly formed, validly existing and in good standing under the laws of the State of its organization and is qualified to do business in the State in which the Property is located. Borrower is a Single Purpose Entity. Borrower has no indebtedness for borrowed money other than the Indebtedness.

(b)     Exhibit C accurately depicts the ownership structure of Borrower. Each Borrower Party has the requisite authority to execute, deliver and carry out the terms and provisions of this Agreement, the Loan Documents and other documents to be executed and delivered by Borrower and each Guarantor, as applicable, pursuant to this Agreement. This Agreement constitutes, and the Loan Documents and other documents to be executed and delivered pursuant to this Agreement, when executed and delivered pursuant hereto, will constitute, the duly authorized obligations of the party or parties, other than Lender, executing the same.

(c)     True and complete copies of the Organizational Documents have been furnished to Lender, and there are no other agreements, oral or written, relating to any Borrower Party as regards the ownership and governance of any Borrower Party. The Organizational Documents were duly executed and delivered, are in full force and effect, and are binding upon and enforceable in accordance with their terms. No breach exists under the Organizational Documents and no act has occurred and no condition exists or after giving effect to this Agreement and the Loan Documents will exist, which, with the giving of notice or the passage of time, or both, would constitute a breach under or violate the Organizational Documents.

(d)     All consents, approvals or authorizations of or declarations, registrations or filings with any Governmental Authority or nongovernmental person or entity, including any creditor, member, partner or shareholder, as applicable of any Borrower Party, required in connection with the execution, delivery and performance of this Agreement or any of the Loan Documents, other than the recordation of the Mortgage and the filing of Financing Statements, have been obtained except for such consents, approvals or authorizations of or declarations or filings with any Governmental Authority or non-governmental person or entity where the failure to so obtain would not have a Material Adverse Effect on any Borrower Party or the prospect of repayment of the Indebtedness.

(e)     No Borrower Party is insolvent and there has been no:  (i) assignment made for the benefit of the creditors of any of them; (ii) appointment of a receiver for any of them or for the property of any of them; or (iii) Insolvency Proceeding instituted by or against any of them.

(f)     None of Borrower or any Guarantor is in default under any Material Agreement or any other agreement to which Borrower or such Guarantor is a party, except for any default which could not have a Material Adverse Effect on Borrower or such Guarantor or the prospect of repayment of the Indebtedness or performance of the Obligations.  No notice of default has been delivered by Borrower or Guarantor to any other party to a Material Agreement. The execution and delivery of the Loan Documents and the performance by Borrower and each Guarantor of their respective obligations under the Loan Documents:  (i) do not violate any Applicable Laws; and (ii) do not conflict with, are not inconsistent with, and will not result, in any breach of any of the terms, covenants, conditions or provisions of, or constitutes a default under, any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind which creates, represents, evidences or provides for any Lien, upon any of the assets of Borrower or any Guarantor, or any other indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which Borrower or any Guarantor, is a party or by which Borrower or any Guarantor, may be bound.

(g)     Except as set forth on Exhibit D attached hereto there are no actions, suits or proceedings pending or, to Borrower's Knowledge, threatened against or affecting Borrower, any Guarantor or the Property before any court or any governmental, administrative, regulatory, adjudicatory or arbitrational body or agency of any kind, including, without limitation, suits, actions or proceedings under the Racketeer Influenced and Corrupt Organizations Act of 1970, as amended, which could have a Material Adverse Effect on Borrower or such Guarantor.

(h)     Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA; the assets of Borrower do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA; Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA; and transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of fiduciaries with respect to governmental plans.

(i)     None of (i) any Borrower Party; (ii) any person or entity Controlling or Controlled by Borrower or any Guarantor; (iii) any person or entity having a beneficial interest

in Borrower or any Guarantor, to the extent not a publicly held entity; (iv) any person or entity for whom Borrower is acting as agent or nominee in connection with this transaction; (v) any of the foregoing persons' or entities' partners, members, shareholders or other equity owners and none of their respective employees, officers, directors, representatives or agents; or (vi) to Borrower's Knowledge, any tenant of the Project, is an OFAC Prohibited Person.

(j)     Except for agreements approved by Lender, there are no agreements between Borrower and any of its Affiliates or Affiliates of a Guarantor relating to the Property.

(k)     No material adverse change has occurred in the operations or financial condition of Borrower or any Guarantor since the date the last financial statements of Borrower were delivered to Lender.

(l)     All financial data and statements prepared by or on behalf of Borrower and delivered to the Lender prior to the date hereof (i) are true, complete and correct, in all material respects; (ii) accurately represent in all material respects the financial condition or operating results, as applicable, of Borrower or the applicable Guarantor and the Property as of the date of such reports; and (iii) have been prepared in accordance with accounting principles consistently applied which have been approved by Lender.

(m)     Borrower and each Guarantor have filed, or caused to be filed, all material tax returns (federal, state, local and foreign) required to be filed and have paid all amounts of taxes shown thereon to be due (including interest and penalties) and all other taxes (including intangible fees, assessments and other governmental charges or taxes) owing (or necessary to preserve any Liens in favor of the Lender), by Borrower and Guarantor, except for such taxes (i) which are not yet delinquent or (ii) as are being contested in good faith and by proper proceedings, and against which adequate reserves are being maintained.  No extension of time for assessment or payment by a Guarantor of any federal, state or local tax is in effect.

(n)     Neither Borrower nor any Affiliate of Borrower is a "foreign person" within the meaning of Section 1445(f)(3) of the Code.

(o)     Borrower (i) has obtained all Licenses required as of the Closing Date by, and accomplished all filings, notifications, registrations and qualifications with (or obtained exemptions from any of the foregoing from), and (ii) will obtain, during the course of each Construction Project as and when required, all Licenses, and accomplish all filings, notifications, registrations and qualifications with (or obtain exceptions from any of the foregoing from), applicable Governmental Authorities to properly and legally own, develop, construct, manage and operate the Property and to conduct its business.  All Licenses are or will be, valid and in full force and effect, and are not, or will not be, subject to any pending or, to Borrower's Knowledge, threatened, administrative or judicial proceeding to revoke, cancel or declare any of such Licenses invalid.  Borrower is not in default or violation with respect to any of the Licenses in a manner that could have a Material Adverse Effect, and no event has occurred which constitutes, or, to Borrower's Knowledge, with due notice or lapse of time or both may constitute, a default by Borrower under, or a violation of, any of the Licenses that could have a Material Adverse Effect.

(p)     Borrower (i) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (ii) has received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities. The fair saleable value of Borrower's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than its probable liabilities, including the maximum amount of Borrower's contingent liabilities or its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out Borrower's business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of its obligations).

(q)     Borrower has not purchased any portion of the Property with proceeds of any illegal activity.

### 4.1.3   The Loan.

(a)     The interest and other fees and charges to be received by Lender under this Agreement and the Loan Documents constitute lawful interest and are neither usurious nor illegal.

(b)     The Loan Budget represents a full, complete, accurate and good faith estimate of all uses of the Loan proceeds.

(c)     No brokerage fees or commissions are payable by or to any person in connection with this Agreement or the Loan other than the Broker(s), if any.

(d)     No information contained in this Agreement, the other Loan Documents to which it is a party, or any written statement furnished by or, to Borrower's Knowledge, on its behalf pursuant to the terms of this Agreement contains any untrue statement of a material fact or omits to state a fact necessary to make the statements contained herein or therein not materially misleading in light of the circumstances under which they were made. To Borrower's Knowledge, there is no condition, fact, circumstance or event which has not been disclosed to Lender that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise could have a Material Adverse Effect. To Borrower's Knowledge, Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that would cause any representation or warranty made herein to be materially misleading.

(e)     No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purpose

prohibited by Applicable Laws or by the terms and conditions of this Agreement or the other Loan Documents.

(f)     Each Loan Document constitutes Borrower's legal, valid and binding obligation, enforceable against it in accordance with its terms, subject only to Insolvency Laws and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or any Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents to which Borrower or any Guarantor is a party, or the exercise of any right thereunder, render the Loan Documents to which Borrower or such Guarantor is a party unenforceable, subject to Insolvency Laws and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), and none of Borrower or any Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

### 4.1.4   Environmental Matters.

(a)     To Borrower's Knowledge, except as shown in that certain Phase I Environmental Site Assessment Report dated February 9, 2006 and prepared by LandAmerica Assessment Corporation (the "**Delivered Report**"), the Property complies with all Environmental Laws.

(b)     To Borrower's Knowledge, except as shown in the Delivered Report no spill, release or discharge of any Hazardous Substances has occurred on or about the Property nor is there any threat of a spill, release or discharge.

(c)     Borrower has not used the Property, nor permitted the Property to be used, for the treatment, storage or disposal of any Hazardous Substance, and, to Borrower's Knowledge, no such use of the Property was made by any predecessor in interest or any other individual or entity.

(d)     To Borrower's Knowledge, except as shown in the Delivered Report no equipment on the Property contains polychlorinated biphenyls.

(e)     To Borrower's Knowledge, except as shown in the Delivered Report no underground storage tank is located on the Property.

(f)     To Borrower's Knowledge, except as shown in the Delivered Report no asbestos is located on the Property.

(g)     To Borrower's Knowledge, except as shown in the Delivered Report the Property does not contain any facility subject to reporting under Section 312 of the federal Emergency Planning and Community Right-to-Know Act of 1986 or any federal regulations promulgated thereunder.

(h)     Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to environmental conditions in, on, under or from the Property that is

known to it and that is contained in its files and records, including but not limited to any reports relating to Hazardous Substances.

(i)     To Borrower's Knowledge, there is no Environmental Claim pending or, to Borrower's Knowledge, threatened.

(j)     To Borrower's Knowledge, no Liens are presently recorded with the appropriate land records under or pursuant to any existing Environmental Law with respect to the Land or the Improvements and, to Borrower's Knowledge, no Governmental Authority has commenced taking or is in the process of taking any action to subject the Land and the Improvements to Liens under any existing Environmental Law.

4.2    **Reliance Upon Representations and Warranties.**  All representations and warranties made in this Agreement or in any certificate or other document delivered to Lender by or on behalf of Borrower or any Guarantor or any Authorizing Entity shall be true and correct when made and shall be deemed remade upon each request for an Advance (unless Lender is notified in writing as to any respects in which such representations and warranties are no longer true as of the date of the notice) and shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, and shall survive the making of the Initial Disbursement and each Advance.  Borrower acknowledges that the Initial Disbursement and each Advance is intended to be made by Lender in reliance upon the performance of all of the terms and conditions contained herein and upon the continuing truth and accuracy of the representations, warranties, acknowledgments and agreements herein contained or otherwise made in writing to Lender.  If, due to circumstances beyond the control of all Borrower Parties, any representation or warranty becomes untrue after any date when such representation was made or last deemed remade, and provided that Borrower promptly notifies Lender of the manner in which any representation or warranty is no longer true upon Borrower first learning thereof, such change of circumstances shall not, in and of itself (and without excusing Borrower from any covenants hereunder), constitute an Event of Default, provided further that the continued truth and accuracy of all representations and warranties set forth herein shall be a condition to all Advances.

## ARTICLE 5
## COVENANTS

5.1    **Covenants.**  Borrower shall perform the following covenants, fully and faithfully, at all times until the Indebtedness has been paid in full and all Obligations fully satisfied.

### 5.1.1    **Financial.**

(a)     Within fifteen (15) days after each calendar month, Borrower shall furnish Lender with a copy of (i) Borrower's income statement showing all Revenues, accrued real estate taxes and all items of operating expense, capital expenditures and reserves paid with Revenues, (ii) Borrower's balance sheet, (iii) Borrower's cash flow statement and (iv) the Property rent roll for the preceding month and the calendar year to date showing a comparison of the actual results to the Operating Budget.

(b)     Borrower shall prepare and submit to Lender such other financial statements and reports as Lender may reasonably require. All financial statements shall be in a format approved by Lender and certified as true, correct, and complete and not misleading as to Borrower's financial condition by an officer or authorized representative of Borrower approved by Lender. The monthly financial statements shall certify that there are no pending claims against Borrower or, if any such claims exist, the nature and amount of each such claim. Borrower's financial statements shall be prepared in accordance with real estate management financial reporting principals approved by Lender and consistently applied.

(c)     No later than March 1 of each year Borrower shall furnish Lender (i) with a copy of Borrower's annual financial statements for the prior calendar year, including an income statement, cash flow statement and balance sheet which financial statements shall be certified by an officer of Borrower approved by Lender and (ii) a certificate from an officer of Borrower approved by Lender that there are no Defaults.

(d)     No later than November 1 of each year, Borrower or Property Manager shall prepare for Lender's review and approval an annual business plan for the Property including a marketing plan, capital improvements, projected lease rates for available space and a projected operating budget, including anticipated capital expenditures, for the succeeding calendar year. The operating budget, once approved by Lender, shall constitute the Operating Budget for the period covered by said budget.

(e)     No later than March 1 of each year, Borrower shall cause each Guarantor to submit financial statements containing statements of income and expenses for the previous year and assets and liabilities as of the last day of the previous year or, as applicable, as at the date of the statements. Such statements shall be certified as true, correct and complete and not misleading as to such Guarantor's financial condition.

(f)     If Borrower omits to prepare and deliver promptly any report required by the preceding paragraphs, Lender may elect, in addition to exercising any remedy for an Event of Default, to have an independent certified public accountant selected by Lender make an audit of all books and records of Borrower including its bank accounts which in any way pertain to the Property and to prepare the statement or statements which Borrower failed to procure and deliver. Borrower shall pay all expenses of the audit and other services, which expenses shall be due and payable upon demand.

(g)     Borrower shall keep and maintain separate books and records with respect to the Property. Borrower will allow Lender, its representatives or agents, at any time during normal business hours, access to all books and records of Borrower, including Borrower's books of account and all supporting and related vouchers or papers kept by or on behalf of Borrower or its representatives or agents in connection with maintenance, operation or leasing of the Property, such access to include the right to make extracts or copies thereof.

(h)     At all times during the term of the Loan, Borrower hereby acknowledges and agrees that CVI shall be required to maintain (i) a tangible net worth, determined in accordance with sound accrual basis accounting principles consistently applied, of not less than

$60,000,000; and (ii) cash and readily marketable securities in an amount not less than $1,500,000.

### 5.1.2 **Impositions.**

(a) Subject to <u>Section 2.5.3</u>, Borrower shall pay all Impositions before the same become delinquent and upon written request, shall furnish to Lender duplicate receipts for such payment. Unless Lender has paid such Impositions directly on Borrower's behalf, Borrower shall furnish to Lender evidence that all Impositions are paid at least five (5) Business Days prior to the last date for payment of such Impositions and before imposition of any penalty or accrual of interest.

(b) Notwithstanding the foregoing, so long as no Event of Default or monetary Default has occurred and is then continuing, Borrower may in good faith, with reasonable diligence and at Borrower's sole and expense contest the validity or amount of any Impositions, provided that:

(i) such contest prevents or suspends the collection of the Contested Taxes and the sale or forfeiture of all or any part of the Property to satisfy the payment of the Contested Taxes; and

(ii) Borrower notifies Lender in writing of Borrower's intent to contest before any Contested Taxes have been increased by any interest, penalties or other costs; and

(iii) Borrower has deposited with Lender to be held by Lender, together with the sums provided in subsection (c) below, a sum of money which taken with the deposits already held by Lender pursuant to subsection (c) below is sufficient in Lender's reasonable judgment to pay the amount of the Contested Taxes, including interest and penalties, and Borrower shall increase such deposits upon demand by Lender whenever Lender reasonably deems such additional deposit necessary to cover the cost of additional interest and penalties.

(c) If Borrower fails to pursue the proceeding for the Contested Taxes with reasonable diligence or if Borrower fails to deliver to Lender the additional deposits required in this subsection (c), Lender may, at Lender's option, apply such additional deposits to the payment of all or any portion of the Contested Taxes, including all penalties and interest. If the amount of the additional deposits is insufficient to pay the Contested Taxes together with all interest and penalties, Borrower shall upon demand deposit an amount sufficient to make such payment of the Contested Taxes in full. Provided no Event of Default then exists and Borrower has notified Lender in writing that Borrower has obtained a final disposition of the Contested Taxes, together with an official tax bill for such Contested Taxes, Lender shall use the funds on deposit with Lender, together with the Monthly Tax Deposits relating to such Contested Taxes, to pay the Contested Taxes in full.

### 5.1.3 **Insurance.**

(a) Until the Indebtedness is fully paid and all obligations of Lender under the Loan Documents have been finally terminated, all of the Collateral shall be kept at all times insured against loss and damage by such hazards, casualties and contingencies in such amounts,

subject to such deductibles, and for such periods as may from time to time be reasonably required by Lender. All insurance shall be written in policies and by insurance companies approved by Lender. All policies of insurance and renewals thereof shall contain standard noncontributory Lender or mortgagee clauses or loss payable clauses in favor of Lender and its successors and assigns or shall name Lender and its successor and assigns as an additional insured and shall provide for at least thirty (30) days' prior written notice of modification (including cancellation) to Lender without cost to Lender as well as a waiver of subrogation endorsement and such other endorsements as Lender shall require. All policies of insurance and renewals thereof shall contain such further endorsements as Lender may require, in form and content acceptable to Lender. Without limiting the generality of the foregoing, all policies of insurance shall be in amounts and have deductibles (if any) approved by Lender and contain clauses or endorsements to the effect that no act or negligence of Borrower, or anyone acting for Borrower or of any tenant under any Lease or other occupant, or failure to comply with the provisions of any policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way effect the validity or enforceability of the insurance insofar as Lender is concerned. Copies of all policies of insurance and original certificates of insurance on ACORD forms acceptable to Lender, together with evidence of fully paid premiums, shall be delivered to Lender as issued at least thirty (30) days before the expiration of old policies and shall be held by Lender until all Obligations have been fully paid and performed and all obligations of Lender under the Loan Documents finally terminated. Upon request by Lender, Borrower, at its sole cost and expense, shall furnish to Lender evidence of the replacement cost of the Property that is satisfactory to Lender. In case of any transfer of title to the Property either resulting from an exercise of remedies under or pursuant to the Mortgage or in lieu of such remedies, complete title to all policies of insurance required by this Agreement and to all prepaid or unearned premiums thereon shall pass to and vest in the grantee or other transferee of the Property. Lender shall not, by reason of accepting, rejecting, approving or obtaining insurance, incur any liability for payment of losses.

(b)     Without in any way limiting the generality of the foregoing, Borrower covenants and agrees to maintain the following insurance coverage: (i) all risk of physical loss or special perils coverage insurance, for an amount equal to not less than one hundred percent (100%) of the full replacement cost of the Improvements and fixtures located on the Property, written on a replacement cost basis and with endorsements covering replacement cost (without depreciation), an agreed amount pertaining to the co-insurance clause, building ordinances/enforcement of law (including demolition and increased cost of construction, which building ordinance coverage endorsement shall be in such amount as Lender may reasonably require), vandalism, malicious mischief, terrorist acts, building collapse, boiler and machinery, sewer back up; (ii) rent loss insurance in an amount equal to not less than gross revenue from the Property for twelve (12) months based upon one hundred percent (100%) occupancy of all Improvements, less any allocable charges and expenses which would not continue during the period of restoration; (iii) commercial general public liability and property damage insurance with a broad form coverage endorsement for an amount as reasonably required from time to time by Lender but not less than an aggregate amount of Five Million Dollars ($5,000,000.00) and an occurrence limit of not less than Three Million Dollars ($3,000,000.00) combined single limit; (iv) flood insurance whenever in the opinion of Lender such protection is necessary and is available; (v) earthquake insurance whenever in the opinion of Lender such protection is necessary and is available; (vi) insurance covering pressure vessels, pressure piping and

machinery, if any, and all major components of any centralized heating or air-conditioning systems located in the Improvements, in an amount satisfactory to Lender, such policies also to insure against physical damage to the Improvements arising out of peril covered thereunder; and (vii) such other insurance that may be required from time to time by Lender. Prior to commencement of any Construction Project, Borrower shall have delivered to Lender a so-called Builder's Risk Completed Value non-reporting form insurance policy for one hundred percent (100%) of the insurable replacement value of the applicable Construction Work. After the Conversion Conditions are satisfied, hazard insurance on the Improvements (other than any portion thereof covered by condominium unit owner's insurance) shall be satisfied through the insurance purchased by the Association. All insurance policies shall be issued by an insurer licensed to do business in the jurisdiction in which the Property is located and which has a rating of at least "A" by Standard & Poor's or A/A- :VIII by A.M. Best as published in Best's Key Rating Guide.

(c)     If at any time a dispute arises with respect to replacement cost, Borrower agrees to provide at Borrower's expense, an insurance appraisal prepared by an insurance appraiser approved by Lender, establishing the full replacement cost in a manner satisfactory to the insurance carrier.

(d)     Borrower shall pay or cause to be paid, in a timely manner, all Premiums. At least thirty (30) days prior to the expiration of any policy of insurance, Borrower shall furnish to Lender renewal insurance policies (or certificate of insurance on Acord 27) as required by this Agreement and the other Loan Documents.

(e)     Borrower shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained hereunder unless Lender is included thereon as the loss payee or an additional insured as applicable, under a standard mortgagee clause acceptable to Lender and such separate insurance is acceptable to Lender.

(f)     Unless Borrower provides Lender with evidence of the insurance coverage required by this Agreement, Lender may purchase insurance at Borrower's expense to protect Lender's interest in the Property. This insurance may, but need not, protect Borrower's interests. The coverage Lender purchases may not pay any claim Borrower makes or any claim that is made against Borrower in connection with the Property. Borrower may later request Lender to cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by this Agreement. If Lender purchases insurance required to be provided under this Agreement, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Indebtedness and shall bear interest at the Default Rate. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

### 5.1.4   Leases.

(a)     Without the prior written consent of Lender, such consent not to be unreasonably withheld, Borrower shall not (i) enter into any Lease, (ii) modify, amend, renew,

extend or terminate any Lease, (iii) accept any rental payment (other than security deposits) on a Lease for more than one month in advance of its due date, or (iv) enter into any ground lease of the Property. Except for Residential Leases, Borrower shall submit to Lender for review a copy of each proposed Lease (marked to show changes from the form, if any, approved by Lender), together with financial information regarding the proposed tenant and such other information as Lender may reasonably request no less than ten (10) Business Days prior to execution thereof. All Lease renewals or extensions and all proposed Leases shall provide for rental rates and terms which at least approximate local market rates and shall be arm's length transactions with bona fide, third party tenants. Notwithstanding the foregoing, any Residential Lease on a form approved by Lender shall not require Lender's prior approval. At Lender's request, Borrower shall cause the tenant under any Lease (other than Residential Leases) to execute a subordination and attornment agreement in form and substance satisfactory to Lender. If requested by Lender, Borrower shall provide Lender with a copy of a fully executed original of each Lease executed subsequent to the Closing Date promptly following its execution.

(b)     Borrower will not suffer or permit any breach or default to occur in any of Borrower's obligations under any of the Leases nor suffer or permit the same to terminate by reason of any failure of Borrower to meet any requirement of any Lease including those with respect to any time limitation within which any of Borrower's work is to be done or the space is to be available for occupancy by the tenant. Borrower shall use reasonable efforts to notify Lender promptly in writing in the event a tenant commits a material default under a Lease (other than a Residential Lease). Borrower will not waive any rights under any of the Leases and will enforce the obligations of tenants under and guarantors of the Leases, including amendments approved by Lender.

(c)     Borrower shall deliver all tenant security deposits, including letters of credit, to Property Manager to be held in trust pursuant to Applicable Laws, subject in each case to the rights of the applicable tenant to the return of such security deposit in accordance with the applicable Lease. Upon forfeiture of any security deposit, Borrower shall cause Property Manager to pay to Lender the amount thereof, which shall be deposited into the CapEx Reserve. All lease termination payments or fees shall be paid to Lender and shall be deposited into the CapEx Reserve.

### 5.1.5  Operations.

(a)     Borrower shall comply with all Applicable Laws with regard to the Property and the Project.

(b)     At all times, Guarantors shall be in charge of executing Borrower's business plan and shall exercise operational and management control, including day-to-day business decisions, with respect to the Property and the Project, except for those duties delegated to Property Manager under the Management Agreement. Borrower shall not replace the Property Manager (or permit the replacement of the Property Manager by assignment of the Management Agreement or otherwise) or modify or terminate (except for the Property Manager's default) the Management Agreement or enter into any property management or exclusive leasing agreement without in each case Lender's prior written consent. Borrower shall enforce all material

CH01/ 12462729.7                                    -27-

obligations of Property Manager under the Management Agreement and shall not waive any of such obligations.

(c)     All Personal Property shall continue to be located on the Land. Borrower shall not, without the prior written consent of Lender, sell, assign, transfer, remove or permit to be removed from the Land or the Improvements any of the Personal Property. So long as no Event of Default exists, Borrower may sell or otherwise dispose of the Personal Property when obsolete, worn out, inadequate, unserviceable or unnecessary for use in connection with the Project, but only upon replacing the same with other Personal Property at least equal in value and utility to the Personal Property that is disposed, and provided that the priority and perfection of Lender's security interest is fully preserved in such replacement Personal Property. Borrower shall, from time to time, on request of Lender, deliver to Lender an inventory of the Personal Property in reasonable detail. All Personal Property, and all replacements thereof, substitutions therefor or additions thereto, at all times, shall be kept and maintained free and clear of Liens, except for Permitted Exceptions. Borrower shall, upon demand, execute and deliver to Lender such financing statements and other documents in form satisfactory to Lender, and will do all such acts and things as Lender may at any time, or from time to time, reasonably request or as may be necessary or appropriate to establish and maintain a first perfected security interest in the Personal Property, free of any Liens, except for Permitted Exceptions.

(d)     Borrower shall: (i) promptly repair, restore or rebuild any Improvements now or hereafter on the Land which may become damaged or be destroyed, such restored or rebuilt Improvements to be of at least equal value and substantially the same character as prior to such damage or destruction, provided that any Loss Recoveries relating to such damage or destruction have been released to Borrower under the terms of this Agreement to effectuate such repairs or restoration, but regardless of whether such Loss Recoveries are sufficient for such repairs or restoration are available or sufficient for the purpose; (ii) keep the Property in good condition and repair and without waste, (iii) pay all operating costs for the Property and immediately pay when due any indebtedness which may be secured by a Lien, and upon request deliver to Lender satisfactory evidence of the discharge of such Lien, subject to any right Borrower may have hereunder to contest such Lien; (iv) complete within a reasonable time any Improvements now or at any time in process of construction upon the Property; (v) comply with all requirements of all covenants, easements and restrictions of record with respect to the Property and the use thereof; (vi) not make any alterations to the Property or demolish any portion of the Improvements or repairs and replacements in the ordinary course of business) without Lender's prior written consent, except as required by Applicable Law; (vii) not suffer or permit any change in the general nature of the occupancy of the Property, without Lender's prior written consent; (viii) not initiate or acquiesce in any zoning reclassification or variance without Lender's prior written consent; (ix) provide and thereafter maintain adequate parking areas within the Property as may be required by Applicable Laws, together with any sidewalks, aisles, streets, driveways and sidewalk cuts and sufficient paved areas for ingress, egress, and right of way to and from the adjacent public thoroughfares necessary or desirable for the use thereof, and observe and comply with any conditions necessary to preserve and extend any and all rights, licenses, permits (including, without limitation, zoning variances, special exceptions and nonconforming uses), privileges, franchises and concessions that are applicable to the Property and the use and occupancy of the Property; (x) not cause or permit any resubdivision of the Land or the Conversion prior to satisfaction of all requirements of Applicable Laws; (xi) not grant any

easements, licenses, covenants, conditions or declarations of use against the Property except for the Declaration; (xii) use best efforts to operate the Property and the Project in conformity with the Operating Budget; (xiii) promptly perform and observe all agreements required to be performed by it under all Material Agreements and the Management Agreement; (xiv) give Lender notice of any default under Leases (other than Residential Leases), Material Agreements and the Management Agreement; (xv) not amend any document which is a Permitted Exception, including the Declaration, without in each case Lender's prior written consent, which consent will not be unreasonably withheld; and (xvi) promptly correct all defects (other than of an immaterial nature that do not affect the use of the Improvements for their intended purpose or their value) in the Improvements or any departure from the Construction Documents (except for non-material deviations therefrom that do not adversely affect the use of the Improvements for their intended purpose or their value) not previously approved by Lender to the extent required hereunder. Borrower agrees that the making of any Advance whether before or after such defects or departures are discovered by, or brought to the attention of, Lender shall not constitute a waiver of the Lender's right to require compliance with this covenant.

### 5.1.6 <u>Prohibition on Conveyances and Liens.</u>

(a)     Borrower shall not:  (i) assign or attempt to assign its rights under this Agreement and any purported assignment of this Agreement shall be void or (ii) suffer or permit (A) any change in the management (whether direct or indirect) of the Property, (B) any Transfer other than a Permitted Transfer or (C) any replacement of any Authorizing Entity without in each case the prior written consent of Lender.

(b)     Without limiting the foregoing, should Borrower engage in or permit a Transfer, whether or not approved by Lender, including a Permitted Transfer, that would constitute or result in the occurrence of one or more non-exempt prohibited transactions under ERISA or the Internal Revenue Code, Borrower shall promptly (i) unwind any such Transfer upon notice from Lender or, at Lender's option, assist Lender in obtaining such exemption(s) from the Employee Benefits Security Administration with respect to such Transfer as Lender may deem necessary or appropriate, and (ii) reimburse Lender for any expenses incurred by Lender to obtain any such exemptions. Borrower's obligations under this subsection (b) shall survive the expiration of this Agreement and the other Loan Documents.

(c)     Borrower shall not suffer or permit any mechanic's or other lien or claim to be filed or otherwise asserted against the Property or any portion thereof and will promptly discharge the same if any claim for lien or any proceedings for the enforcement thereof are filed or commenced; provided, however, that so long as no Event of Default or monetary Default has occurred and is then continuing and Borrower has notified Lender in writing of its intent to contest such lien or claim, Borrower shall have the right to contest in good faith and with due diligence the validity of any such lien or claim upon furnishing to the Title Company such security or indemnity as it may require to induce the Title Company to issue an endorsement to the Title Policy insuring against all such claims, liens or proceedings; and provided further that Lender will not be required to make any further Advances unless any such mechanic's or other liens or claims has been released or insured against by the Title Company to the sole satisfaction of Lender.