5.1.7 **Single Purpose Entity/Change in Structure.** Borrower shall:

(a) maintain its existence as a Single Purpose Entity;

(b) not, without the prior written consent of Lender in each case, cause or permit (i) any amendment, replacement or termination of its Organizational Documents or the Organizational Documents of any Authorizing Entity, (ii) the creation of any new membership, partnership or shareholder interests, as applicable, in Borrower or any Authorizing Entity, (iii) any dissolution, voluntary termination of its existence or involuntary termination of its existence, unless such involuntary termination is rescinded or Borrower's existence is reinstated within thirty (30) days), or (iv) any change in Borrower's or any Authorizing Entity's state of formation or name;

(c) not hold or acquire any ownership interest, legal or equitable, in any real or personal property other than the Property or become a shareholder of or a member or partner in any entity;

(d) not change its legal status as a limited liability company or engage in any business other than, the acquisition, operation, management and disposition of the Property;

(e) maintain Borrower's assets, accounts, books, records, financial statements, stationery, invoices, and checks separate from and not commingled with any of those of any other person or entity;

(f) conduct Borrower's business in Borrower's name, pay Borrower's liabilities out of Borrower's funds, allocate fairly and reasonably any overhead for shared employees and office space, and maintain an arms-length relationship with Borrower's Affiliates;

(g) hold itself out as a separate entity, maintain adequate capital in light of its contemplated business operations, and observe all organizational formalities;

(h) not guarantee or become obligated for the debts of any other entity or person or hold out Borrower's credit as being available to satisfy the obligations of others, including not acquiring obligations or securities of Borrower's partners, members or shareholders;

(i) not pledge Borrower's assets for the benefit of any other entity or person or make any loans or advances to any person or entity;

(j) not enter into any contract or agreement with any party which is an Affiliate, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any Affiliate;

(k) neither seek nor allow any owner of any membership or partnership interest, capital stock or other interest in Borrower to seek, the dissolution or winding up, in whole or in part, of Borrower;

CH01/ 12462729.7

(l)    not merge with or be consolidated into any other entity;

(m)    maintain Borrower's assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify Borrower's individual assets from those of any constituent party of Borrower, any Affiliate of Borrower, any Authorizing Entity, any Guarantor or any other person or entity; or

(n)    not incur any debts or financial obligations other than the Obligations and normal accounts payable in the ordinary course of business of not more than $200,000 in the aggregate and which are not more than sixty (60) days past due.

5.1.8  **Environmental Matters**. Borrower will:

(a)    not install, use, generate, manufacture, produce, store, release, discharge or dispose of on, under or about the Property, nor transport to or from the Property, any Hazardous Substance nor allow any other person or entity to do so except in minor amounts and under conditions permitted by Applicable Laws;

(b)    keep and maintain the Property in compliance with, and shall not cause or permit the Property to be in violation of, any Environmental Law;

(c)    give prompt notice to Lender of (i) any proceeding, investigation or inquiry commenced by any governmental authority with respect to the presence of any Hazardous Substance on, under or about the Property or the migration thereof to or from adjoining property; (ii) all claims made or threatened by any individual or entity against Borrower or the Property relating to any loss or injury allegedly resulting from any Hazardous Substance; and (iii) the discovery by Borrower of any occurrence or condition on any real property adjoining or in the vicinity of the Property which might cause the Property or any part thereof to be subject to any restriction on the ownership, occupancy, transferability or use of the Property under any Environmental Law; and

(d)    grant to Lender the right and privilege to: (i) join in and participate in, as a party if it so elects, any one or more legal proceedings or actions initiated with respect to the Property under any Environmental Law; and (ii) have all costs and expenses thereof (including without limitation Lender's reasonable attorneys' fees and costs) paid by Borrower.

5.1.9  <u>Terrorism and Anti-Money Laundering</u>.

(a)    Borrower shall, and shall cause all Authorizing Entities to, comply with applicable federal anti-terrorism and anti-money laundering laws and regulations. All payments by Borrower to Lender or from Lender to Borrower will only be made in Borrower's name and to and from a bank account of a bank based or incorporated in or formed under the laws of the United States or a bank that is not a "foreign shell bank" within the meaning of the U.S. Bank Secrecy Act (31 U.S.C. § 5311 *et seq.*), as amended, and the regulations promulgated thereunder by the U.S. Department of the Treasury, as such regulations may be amended from time to time.

(b)    Borrower shall provide Lender, from time to time, with such information as Lender determines to be necessary or appropriate to comply with the anti-money laundering

laws and regulations of any applicable jurisdiction, or to respond to requests for information concerning the identity of Borrower, any Authorizing Entity or other person or entity controlling or controlled by Borrower or any person or entity having a beneficial interest in Borrower, from any governmental authority, self-regulatory organization or financial institution in connection with its anti-money laundering compliance procedures, or to update such information.

(c)     Borrower shall promptly notify Lender in writing should Borrower become aware of any change in the information set forth in these representations.

5.1.10 **Anti-Forfeiture.**  Borrower represents and warrants to Lender that there has not been committed by Borrower or any other person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any other Collateral or any monies paid in performance of Borrower's obligations under the Loan Documents. Borrower shall not commit, permit or suffer to exist any act, omission, or circumstance affording such right of forfeiture.  In furtherance thereof, Borrower hereby indemnifies Lender and agrees to defend with counsel acceptable to Lender at Borrower's sole cost and hold Lender harmless from and against any loss, damage or injury (including without limitation attorneys' fees and costs incurred by Lender) by reason of the breach of the covenants and agreements or the representations and warranties set forth in this paragraph. Without limiting the generality of the foregoing, the filing of formal charges or the commencement of proceedings against Borrower or all or any part of the Collateral under any federal or state law for which forfeiture of the Property or any other Collateral or of any monies paid in performance of Borrower's obligations under the Loan Documents is a potential result, shall, at the election of Lender, constitute an Event of Default hereunder without notice or opportunity to cure.

5.2     **Construction Projects.**

5.2.1 **Construction Documents.**  Borrower shall diligently and continuously undertake to Complete each Construction Project.  Borrower shall not enter into, accept or permit any Change Orders without first obtaining Lender's written consent, except that Lender's prior consent shall not be required for (a) any Change Order for less than $25,000 provided that the aggregate value of all Change Orders, whether or not consented to by Lender, for the subject Construction Project does not exceed $200,000 or (b) any Change Order for an Exempt Project so long as the Change Order does not have the effect of changing the Exempt Project to a Construction Project which would not be an Exempt Project.  All Construction Contracts shall provide for a guaranteed maximum price and shall otherwise be in form and substance reasonably satisfactory to Lender.  At Lender's election, Borrower shall cause any or all Construction Contracts to be collaterally assigned to Lender, and shall cause the contractor under any Construction Contract to provide payment and performance bonds, in form and substance satisfactory to Lender.  Borrower shall submit all Construction Documents to Lender for all Construction Projects, including Exempt Projects.  Borrower shall not amend, modify, terminate or waive any rights under any Construction Documents.  Borrower will perform its obligations under the Construction Documents and will enforce the terms of the Construction Documents.

5.2.2  **Permits**.  Borrower shall pay for and obtain or cause to be paid for and obtained all permits, licenses and approvals required by Applicable Laws with regard to each Construction Project, whether necessary for commencement, completion, use or otherwise.

5.2.3  **Contractors**.  Except with respect to Exempt Projects, Borrower shall obtain Lender's approval of all contractors and all contracts and other Construction Documents for each component of the Construction Work.  Except with respect to Exempt Projects, all Construction Documents for each component of the Construction Work shall be assigned to Lender as security for the Loan, which assignments shall be consented to by the applicable contractor(s).  Each contractor or subcontractor performing any of the Construction Work shall be licensed by the appropriate state agency and shall provide Borrower with evidence of adequate liability insurance.  Upon Lender's request, Borrower shall provide written evidence that each contractor and subcontractor meets the requirements of this subsection.

5.2.4  **Deficiency**.  Borrower agrees that, if for any reason Lender concludes that a Deficiency shall exist, regardless of how such condition may have been brought about, Borrower shall, within five (5) days after written request by Lender, deposit the amount of the Deficiency in cash with Lender which deposit shall not bear interest.  Such deposit shall first be fully utilized to pay Project Costs before any further Advance shall be made.

5.2.5  **Lender Consultants**.  At Borrower's expense, Lender shall have the right to employ an inspecting architect, engineer or consultant with respect to a Construction Project.  Borrower shall pay immediately upon demand the reasonable fees and expenses of any architect or engineer employed by Lender for the purpose of reviewing plans or otherwise engaged by Lender with respect to any Construction Project.

5.2.6  **Immediate Post-Closing Repairs**.

(a)  **Bids**.  Borrower shall, within sixty (60) days after the Closing Date, obtain bids for all work identified in that certain Property Condition Report dated February 9, 2006 prepared by LandAmerica Assessment Corporation based on their inspection of the Property (the "**Condition Report**").  All bids shall be submitted to Lender for approval, including, without limitation, approval of the contractor, scope of work and bid amount.

(b)  **Immediate Repairs**.  Borrower shall, within one hundred twenty (120) days after the Closing Date, provide evidence satisfactory to Lender that all repairs described on **Exhibit G** attached hereto and as further described in the Condition Report (but excluding the Retaining Wall Work and the Fire Damage Repairs) (the "**Immediate Repairs**") have been Completed.  The time period provided in this subsection (b) shall be extended for such period of time as may be reasonably required to Complete the Immediate Repairs, but in no event more than an additional ninety (90) days, provided that (i) during such one hundred twenty (120) day period Borrower has promptly commenced all appropriate actions to timely Complete the Immediate Repairs and those actions have been and are thereafter diligently and continuously pursued by Borrower in good faith, (ii) no Default or Event of Default then exists and (iii) Lender is reasonably satisfied with the reasons for any delay in such Completion.

(c)    Retaining Wall Work.  Borrower shall, within one hundred eighty (180) days after the Closing Date, provide evidence satisfactory to Lender that all work described on **Exhibit H** attached hereto that relates to the retaining wall (the "**Retaining Wall Work**"), as further described in the Condition Report, has been Completed.  The time period provided in this subsection (c) shall be extended for such period of time as may be reasonably required to Complete the Retaining Wall Work, but in no event more than an additional ninety (90) days, provided that (i) during such one hundred eighty (180) day period Borrower has promptly commenced all appropriate actions to timely Complete the Retaining Wall Work and those actions have been and are thereafter diligently and continuously pursued by Borrower in good faith, (ii) no Default or Event of Default then exists and (iii) Lender is reasonably satisfied with the reasons for any delay in such Completion.  In the event the Retaining Wall Work has not been timely Completed as required above, Borrower shall deposit with Lender an amount equal to the positive difference between (i) the amount of all costs and expenses, as determined by Lender in its reasonable discretion, necessary to complete the Retaining Wall Work and (ii) the amount then held in the Retaining Wall Reserve, and Borrower hereby acknowledges that Lender shall have the right to use such additional deposit and all funds remaining in the Retaining Wall Reserve to cause the Completion of the Retaining Wall Work.  Such additional deposit shall be made by Borrower within ten (10) days after receipt of notice from Lender.

(d)    Fire Damage Repairs.    Borrower shall, no later than June 30, 2006, provide evidence satisfactory to Lender that all work described on **Exhibit I** attached hereto relating to repairs to the fire damage to Unit 3741D of the Property (the "**Fire Damage Repairs**") has been Completed. The time period provided in this subsection (d) shall be extended for such period of time as may be reasonably required to Complete the Fire Damage Repairs, but in no event more than an additional ninety (90) days, provided that (i) during the time period prior to and including June 30, 2006, Borrower has promptly commenced all appropriate actions to timely Complete the Fire Damage Repairs and those actions have been and are thereafter diligently and continuously pursued by Borrower in good faith, (ii) no Default or Event of Default then exists and (iii) Lender is reasonably satisfied with the reasons for any delay in such Completion.

(e)    Costs.  Lender's reasonable costs relating to review and approval of the bids, the Retaining Wall Work, the Immediate Repairs and the Fire Damage Repairs shall be deemed Charges.

5.3    **General Covenants**.

5.3.1    **Inspections.** Borrower will cooperate with Lender in arranging for inspections, from time to time, of the Property by representatives of Lender, including the inspections and the tests described in Section 3 of the Environmental Indemnity.  Borrower will, and will cause Property Manager and any managing agent to, cooperate with Lender in arranging for inspections, including without limitation, to assist in ascertaining compliance of the Project and the Property with Applicable Laws.

5.3.2    **Further Assurances.**  Borrower shall, from time to time, upon Lender's request, execute, deliver, record and furnish, or cause to be executed, delivered, recorded and furnished, such documents as Lender may reasonably deem necessary or desirable

(i) to perfect, and maintain perfected, valid first liens upon the Collateral, (ii) to correct any errors of a typographical nature which may be contained in any of the Loan Documents, and (iii) to consummate fully the transaction contemplated under this Agreement.

5.3.3 **Interest Rate Agreements**. In the event Borrower enters into any interest rate hedge agreement, interest rate cap agreement, interest rate collar agreement or similar agreements regarding all or any part of the Indebtedness, Borrower shall notify Lender that Borrower has entered into such an agreement and at Lender's request shall assign such agreement to Lender as additional security for the Loan.

5.3.4 **Stamp Tax**. If, by the laws of the United States of America, or of any state or political subdivision having jurisdiction over Borrower, any tax is due or becomes due in respect of the Loan, the granting of the Mortgage, or the terms of any of the other Loan Documents, Borrower shall pay such tax in the manner required by any such law. Borrower further covenants to reimburse Lender for any sums which Lender may expend by reason of the imposition of any tax on the issuance of the Note made pursuant to this Agreement. Notwithstanding the foregoing, Borrower shall not be required to pay any income, franchise or other similar tax of Lender.

5.3.5 **Reports**. Borrower shall deliver, or cause to be delivered, to Lender copies of all inspections, reports, test results and other material information prepared or received by Borrower from time to time from its owners, agents, representatives, architects, engineers, the Property Manager and any other parties involved in the maintenance, operation or leasing of the Property.

5.3.6 **Indemnity**. Except to the extent caused by Lender's gross negligence or willful misconduct, Borrower shall indemnify Lender and hold harmless Lender from and against all claims, injury, damage, loss and liability of any and every kind suffered or incurred by reason of or in connection with (i) the Loan, including the administration thereof, this Agreement, the other Loan Documents, the Property and the leasing thereof, and the use or application of the Loan proceeds; (ii) the operation or maintenance of the Property including inspection fees; (iii) any breach of any representation made herein or of any other provision hereof; or (iv) any other action or inaction by, or matter which is the responsibility of, Borrower. Borrower shall pay Lender upon demand all claims, judgments, damages, losses and expenses (including court costs and reasonable attorneys' fees) incurred by Lender as a result of any legal or other action arising out of matters described in clauses (i) through (iv) of the preceding sentence. The provisions of this Section 5.3.6 shall survive repayment of the Indebtedness.

5.3.7 **No Dividends or Distributions**. Except for (i) operating Revenues available to Borrower under Section 2.6, if any, or (ii) dividends, distributions and payments expressly permitted by this Agreement or otherwise approved by Lender, Borrower shall not make or permit any dividends, distributions or payments of any kind to any member/partner of Borrower, any Guarantor, or any Affiliate thereof. Notwithstanding anything to the contrary herein, asset management fee payments to Brentwood Asset Management & Advisory Group LLC, a California limited liability company ("**Asset Manager**") may only be made from the Borrower Return.

5.3.8  **Notice of Proceedings.** Borrower shall promptly notify Lender of each action, suit or proceeding threatened in writing or commenced as a result of injury, damage or liability occurring in, on or about the Property, other than actions for insured claims of under $100,000 which have been accepted by the insurance carrier without reservation of liability, and any other action, suit or proceeding against Borrower or any Guarantor which could have a Material Adverse Effect upon such party, and Borrower shall, upon Lender's request, at Borrower's expense, resist and defend such action, suit or proceeding, or cause the same to be resisted and defended by counsel designated by Borrower and approved in writing by Lender.

5.3.9  **Appraisals.** Lender shall have the right to obtain a new or updated Appraisal of the Property from time to time. Borrower shall cooperate with Lender in this regard. If the Appraisal is ordered or obtained prior to the Closing Date or in order to comply with any applicable law or regulatory requirement, or if an Event of Default exists, Borrower shall pay for any such Appraisal upon Lender's request.

5.3.10  **Furnishing Reports.** Upon Lender's written request, Borrower shall provide Lender with copies of all inspections, reports, test results and other information received by Borrower which in any way relate to the Property.

5.3.11  **Affiliate Transactions.** Prior to entering into any agreement with an Affiliate pertaining to the Property, Borrower shall deliver to Lender a copy of such agreement, which shall be satisfactory to Lender in its sole discretion. If requested by Lender, such agreement shall provide Lender the right to terminate such agreement upon Lender's (or its designee's) taking possession of the Property or acquisition of the Property through foreclosure, a deed in lieu of foreclosure, sale in accordance with the Code or otherwise.

5.3.12  **Notice of Default.** Borrower shall promptly upon acquiring knowledge thereof advise Lender of any default under any Material Agreement or any change in the condition (financial or otherwise) of Borrower that could be expected to have a Material Adverse Effect or materially impair its ability to comply with its obligations hereunder, or of the occurrence of any Default or Event of Default or the occurrence of any circumstance which would make any representation untrue or constitute a breach of any warranty in any material respect.

5.3.13  **Estoppel Statement.** After written request by Lender, Borrower shall within fifteen (15) Business Days furnish Lender with a statement, duly acknowledged and certified, setting forth (i) unpaid principal amount of the Loan, (ii) the date installments of interest and/or principal were last paid, (iii) that the Loan Documents to which Borrower is a party are valid, legal and binding obligations, subject to insolvency laws and general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law), and have not been modified or, if modified, giving particulars of such modification, and (iv) such other matters as Lender may reasonably request. Any prospective purchaser or assignee of any interest in the Loan shall be permitted to rely on such certificate. Borrower shall request and use reasonable good faith efforts to obtain for the Lender, upon request, estoppel certificates from any tenant in the form set forth on a form reasonably approved by the Lender; provided that Borrower shall not be required to deliver such certificates with respect to any Residential Lease or more frequently than once in any calendar year (unless an Event of Default hereunder or under

any of the Loan Documents then exists, in which case Borrower shall endeavor to obtain as many such certificates as the Lender shall request and, in any event, shall be obligated to obtain only those as to which the tenant under the applicable Lease has committed to provide pursuant to such applicable Lease.

5.3.14 **Place of Business.** Borrower shall not change its executive office or its principal place of business without giving Lender at least thirty (30) days' prior written notice thereof and promptly providing Lender such information as Lender reasonably request in connection therewith.

5.3.15 **Enforcement of Rights.** Borrower shall, upon request from Lender, pursue and enforce all remedies available to Borrower under the Sale and Purchase Agreement dated as of January 12, 2006 between Borrower (as successor to National Commercial Ventures, LLC) and The Courts Apartments Limited Partnership, a Georgia limited partnership.

5.4 **Loss of Note or other Loan Documents.** Upon notice from Lender of the loss, theft, or destruction of the Note and upon receipt of an affidavit of lost note and an indemnity reasonably satisfactory to Borrower from Lender, or in the case of mutilation of the Note, upon surrender of the mutilated Note, Borrower shall make and deliver a new note of like tenor in lieu of the then to be superseded Note. If any of the other Loan Documents were lost or mutilated, Borrower agrees to execute and deliver replacement Loan Documents in the same form of such Loan Document(s) that were lost or mutilated.

## ARTICLE 6
## CASUALTIES AND CONDEMNATION

6.1 **Lender's Election to Apply Loss Recoveries on Indebtedness.**

(a) Lender is authorized to collect and receive any and all Loss Recoveries. Subject to the provisions of Section 6.1(b) below, Lender may elect to collect, retain and apply to the Indebtedness (including, without limitation, the Exit Fee) all Loss Recoveries without prepayment premium or penalty. Any Loss Recoveries remaining after repayment of the Indebtedness shall be paid by Lender to Borrower.

(b) Lender agrees to make available the Loss Recoveries for restoration of the Improvements if (i) no Default or Event of Default exists, (ii) the entire amount of the Loss Recoveries is deposited with Lender, (iii) in Lender's reasonable judgment, the amount of the Loss Recoveries available for restoration is sufficient to pay the full and complete costs of such restoration, or if not sufficient, Borrower has deposited with Lender an amount, which together with the amount of the Loss Recoveries available for restoration of the Improvements, in Lender's reasonable judgment, will be sufficient to pay the full and complete costs of such restoration, (iv) the income from the Property will not, following restoration, decrease more than ten percent (10%) as a result of such casualty or condemnation, (v) the cost of restoration will not exceed thirty percent (30%) of the amount of the Loan funded as of the date of such casualty, (vi) in Lender's sole determination after completion of restoration the Loan Amount will not exceed eighty percent (80%) of the fair market value of the Property, (vii) in Lender's reasonable

determination, the Property can be restored to an architecturally and economically viable project in compliance with Applicable Laws within eighteen (18) months, (viii) each Guarantor reaffirms in writing such Guarantor's obligations under the Loan Documents, and (ix) in Lender's reasonable determination, such restoration will be completed not later than four (4) months prior to the Maturity Date.

(c)     In case of loss or damage by fire or other casualty, Borrower shall promptly give Lender and the insurance companies that have insured against such risks, notice of such loss or damage, and Lender is authorized:

(i)     If an Event of Default has occurred and is continuing, to settle and adjust any claim under insurance policies which insure against such risks; or if no Event of Default then exists to participate in all negotiations regarding settlement and adjustment of claims under insurance policies and approve any settlement; or

(ii)     to allow Borrower, with Lender's consent, to agree with the insurance company or companies on the amount to be paid in regard to such loss; provided that Borrower shall not make any settlement with any insurance company without Lender's consent.

(d)     Borrower shall cooperate with Lender in all reasonable respects in obtaining for Lender the benefits of any insurance proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any out-of-pocket expenses reasonably incurred in connection therewith (including reasonable attorneys' fees and disbursements, and, if reasonably necessary to collect such proceeds, the expense of an appraisal on behalf of Lender in case of a fire or other casualty affecting the Property or any part thereof) out of such as recoveries.

### 6.2     <u>Borrower to Restore</u>.

(a)     In case Lender does not elect to apply or does not have the right to apply the Loss Recoveries to the Indebtedness, as provided in <u>Section 6.1</u> above, Borrower shall:

(i)     Subject to <u>Section 6.1(c)</u> above, proceed with diligence to make settlement with insurers or the appropriate governmental authorities and cause the Loss Recoveries to be deposited with Lender;

(ii)     In the event the Loss Recoveries and the available proceeds of the Loan are insufficient to assure Lender that all contemplated repairs or construction will be completed, promptly deposit with Lender any amount necessary to assure that such contemplated repairs or construction will be completed; and

(iii)     Promptly proceed with the resumption of any affected Construction Project of the improvements and/or the repair of all damage resulting from such fire, condemnation or other cause and restoration to its former condition.

(b)     Any request by Borrower for a disbursement by Lender of Loss Recoveries and funds deposited by Borrower shall be treated by Lender as if such request were for an Advance with respect to a Construction Project, and the disbursement thereof shall be

conditioned upon Borrower's compliance with and satisfaction of the same conditions precedent as would be applicable under this Agreement for an Advance with respect to a Construction Project and subject to any other reasonable disbursement conditions as Lender may impose. If Loss Recoveries shall exceed the amount necessary to complete the repair, restoration or rebuilding of the Improvements, such excess shall be applied on account of the Indebtedness irrespective of whether such Indebtedness is then due and payable without payment of any premium or penalty. If Loss Recoveries shall be insufficient to fully pay for all costs necessary to complete the repair, restoration or rebuilding of the Improvements, the difference shall be treated as a Deficiency.

(c)     No casualty, condemnation or application of Loss Recoveries shall excuse Borrower from complying with all Obligations under the Loan Documents.

(d)     All Loss Recoveries not applied to the Indebtedness shall be held by Lender and shall be deemed to be Deposits.

## ARTICLE 7
## DEFAULT

7.1     **Events of Default.** Each of the following shall constitute an "**Event of Default**" under this Agreement:

(a)     Borrower fails to pay within five (5) days of the date due any installment of principal or interest, or fails to pay all principal or interest due on the Maturity Date, or fails to pay when due any other amount due Lender hereunder or under any other Loan Document or fails to make any deposit required by <u>Sections 2.5.1</u>, <u>2.6</u>, <u>5.1.2(b)</u> or <u>(c)</u>, <u>5.1.4(c)</u> or <u>5.2.4</u> or Borrower breaches or defaults under any of the terms or provisions of <u>Sections 5.1.1</u>, <u>5.1.2</u>, <u>5.1.3</u>, <u>5.1.6(a)</u>, <u>5.1.7</u>, <u>5.1.9</u>, <u>5.2.6</u>, <u>5.3.7</u> or <u>5.3.13</u> of this Agreement or CVI fails to satisfy the provisions of <u>Section 5.1.1(h)</u>; or

(b)     Borrower breaches, defaults under or fails to keep or perform any agreement, undertaking, obligation, covenant, condition, term or provision of this Agreement other than those otherwise described in this <u>Section 7.1</u>, and such breach, default or failure continues for a period of thirty (30) days after written notice from Lender; provided that the cure period provided in this subsection (b) shall be extended for such period of time as may be reasonably required to effect a cure, but in no event more than one hundred twenty (120) days from the date of notice if the breach, default or failure is of a nature that it cannot be cured by the payment of money or cured within the cure period solely for reasons outside of Borrower's control, provided that Borrower has promptly commenced all appropriate actions to cure the default within such cure period and those actions are thereafter diligently and continuously pursued by Borrower in good faith; or

(c)     any representation, warranty or certification, made or given pursuant to any Loan Document by or on behalf of Borrower or any Guarantor or otherwise made by or on behalf of Borrower or any Guarantor or any document delivered to induce Lender to enter into this Agreement or make the Initial Disbursement or any Advance or in connection with or as contemplated by this Agreement, proves to be untrue or fraudulent in any material respect at any

time when such representation, warranty or certification is made or deemed reaffirmed hereunder or such document is delivered; provided that if the circumstances causing such misrepresentation or warranty are capable of cure and Borrower is curing such circumstance, such representation and warranty continues to be untrue ten (10) days after written notice from Lender to Borrower; or

(d)     Borrower shall fail to comply with any requirement of Applicable Law or of any Governmental Authority having jurisdiction within thirty (30) days after Borrower has notice of such requirement, except for failures which do not have a Material Adverse Effect; or

(e)     except as otherwise expressly authorized in this Agreement, Borrower enters into any secondary or additional financing agreements or arrangements of any kind whatsoever without the prior written consent of Lender; or

(f)     there is an attachment, execution or other judicial seizure of any material portion of Borrower's assets or the assets of any Guarantor and such seizure is not discharged within sixty (60) days; or

(g)     any order or decree is entered by any court of competent jurisdiction enjoining or prohibiting Lender, Borrower, any Guarantor, or any thereof, from substantially performing any of such party's obligations under this Agreement, and such order or decree is not stayed or vacated, or the proceedings out of which such order or decree arose are not dismissed, within sixty (60) days after the granting of such decree or order; or

(h)     Borrower, any Authorizing Entity or any Guarantor commences or acquiesces to an Insolvency Proceeding; or

(i)     all or a substantial part of the assets of Borrower, or any Authorizing Entity or any Guarantor are attached, seized, subject to a writ or distress warrant or are levied upon unless the same is released within sixty (60) days; or Borrower, any Authorizing Entity or any Guarantor shall make an assignment for the benefit of creditors or Borrower shall not be generally paying its debts as they become or has admitted in writing to its inability to pay its debts as they become due; or

(j)     the commencement of any involuntary petition in bankruptcy against Borrower, any Authorizing Entity or any Guarantor or the institution against Borrower, any Authorizing Entity or any Guarantor of any reorganization, arrangement, composition, readjustment, dissolution, liquidation or similar proceedings under any present or future federal, state or other statute or law, or the appointment of a receiver, trustee or similar officer for all or any substantial part of the property of Borrower, any Authorizing Entity or any Guarantor which shall remain undismissed or undischarged for a period of sixty (60) days; or

(k)     the dissolution, termination or merger of Borrower, any Authorizing Entity, or the death of any Guarantor, or Richard J. Nathan becomes incapacitated, unless a substitute Guarantor or, as applicable, a substitute individual acceptable to Lender for purposes of carrying out the covenant set forth in Section 5.1.5 has been accepted by Lender in its reasonable discretion within thirty (30) days thereafter; or

(l)     one or more final, unappealable judgments are entered (i) against Borrower in amounts aggregating in excess of $100,000 or (ii) against any Guarantor in amounts aggregating in excess of $500,000, and said judgments are not satisfied, stayed or bonded over within thirty (30) days after entry;

(m)     if Borrower or any Guarantor shall fail to pay any debt owed by it or is in default under any agreement with Lender or any other party (other than a failure or default for which (i) Borrower's maximum liability does not exceed $100,000 and (ii) Guarantor's maximum liability does not exceed $1,000,000 or amounts aggregating in excess of $5,000,000) and such failure or default continues after any applicable grace period specified in the instrument or agreement relating thereto; or

(n)     the occurrence of (i) any "Event of Default" under and as defined in any other Loan Document or (ii) any default or failure to keep or perform any agreement, undertaking, obligation, covenant, condition, term or provision of any other Loan Document which default or failure remains uncured beyond any applicable notice or grace period contained therein.

7.2     **Remedies.**

7.2.1     **Rights of Lender.**  After any Event of Default, Lender shall have the right, in addition to all the remedies conferred upon Lender by law or equity or the terms of any of the Loan Documents, to do any or all of the following, concurrently or successively, without notice to Borrower:

(a)     declare the Indebtedness to be, and the Indebtedness shall thereupon become, immediately due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, anything contained herein or in the Note to the contrary notwithstanding;

(b)     terminate the Lender's obligations under this Agreement to extend credit of any kind or to make any Advance or disbursement, whereupon the commitment and obligations of the Lender to extend credit or to make any Advance hereunder shall terminate;

(c)     enter upon, take possession of, and use the Property and all parts thereof, and all material, equipment and supplies therein, to the extent of Borrower's interest therein, complete the Project and do anything which in its sole judgment is necessary or desirable to fulfill, pay, settle or compromise the obligation to Borrower hereunder and continue to operate the Property;

(d)     use and apply any monies or letters of credit deposited by Borrower with Lender, to cure any such default or to apply on account of any Indebtedness; and

(e)     exercise or pursue any other remedy or cause of action permitted under this Agreement or any other Loan Documents, or conferred upon Lender by operation of Law.

With respect to clause (c) above, Lender and its designees, representatives, agents, licensees and contractors shall be entitled to such entry, possession and use without the consent of any party

and without any legal process or other condition precedent whatsoever. Borrower acknowledges that any denial of such entry, possession and use by Lender will cause irreparable injury and damages to Lender and Lender shall be entitled to injunctive relief to obtain such entry.

7.2.2 **Attorney in Fact.** Without restricting the generality of the foregoing and for the purposes aforesaid in Section 7.2.1, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution in the Property to: Complete any Construction Project or Construction Work in progress; use unadvanced funds remaining under the Note or which may be reserved, escrowed or set aside for any purposes hereunder at any time, or to advance funds in excess of the face amount of the Note; make changes in the applicable Construction Documents which shall be necessary or desirable to Complete each such Construction Project or such Construction Work; retain or employ new general contractors, subcontractors, architects, engineers and inspectors as Lender determines shall be required for said purposes; pay, settle or compromise all existing bills and claims, which may be liens or security interests, or to avoid such bills and claims becoming liens against the Property; execute all applications and certificates in the name of Borrower prosecute and defend all actions or proceedings in connection with any Construction Project or Construction Work; take action and require such performance as it deems necessary under any of the bonds to be furnished and to make settlements and compromises with the surety or sureties thereunder, and in connection therewith, to execute instruments of release and satisfaction; and to do any and every act which Borrower might do in its own behalf; it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked.

7.2.3 **Payments by Lender.** All sums whatsoever paid or incurred by Lender hereunder of any kind whatsoever, shall constitute Indebtedness and shall bear interest from the date of payment or incurrence until paid at the Default Rate.

7.2.4 **Automatic Acceleration.** Notwithstanding the foregoing, upon the occurrence of any Event of Default under Section 7.1(h) and 7.1(j) with respect to Borrower, all Indebtedness shall automatically become due and payable, without any presentment, demand, protest or notice of any kind to Borrower.

7.2.5 **Failure to Clear Liens.** If Borrower shall fail promptly to discharge any mechanics' claim filed or otherwise asserted or to contest any such claim and to cause the Title Company to insure against such claim in the manner required by this Agreement, or, having commenced to contest the same, if Borrower shall thereafter fail to prosecute such contest in good faith or with due diligence, or fail to maintain such security or indemnity so required by the Title Company for its full amount, or, upon adverse conclusion of any such contest, if Borrower shall fail to cause any judgment or decree to be satisfied and lien to be released, then, and in any such event, upon giving notice to Borrower, Lender may, but shall not be required to, (i) procure the release and discharge of any such claim and any judgment or decree thereon, without inquiring into or investigating the amount, validity or enforceability of such lien or claim, and (ii) effect any settlement or compromise of the same or furnish the security or indemnity required by the Title Company. Any amounts so expended by Lender, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be paid by Borrower immediately upon Lender's demand shall be added to the Indebtedness and shall bear interest until paid at the Default Rate.

# ARTICLE 8
# SECURITY AGREEMENT

8.1     **Grant of Security Agreement.**   To secure payment of the Indebtedness and performance of the other Obligations, Borrower hereby grants to Lender a security interest in and to:   (a) all funds of Borrower on deposit from time to time with Lender or any agent of Lender or on deposit in any depository account controlled by Lender, and (b) all Personal Property and all replacements, substitutions and additions to such property described in this paragraph and all proceeds thereof.

8.2     **Nature of Interest.**   Borrower hereby represents, warrants, covenants and agrees as follows:

(a)     Borrower (being the Debtor as that term is used in the Code) is and will be the true and lawful owner of the Personal Property and has rights in and the power to transfer the Personal Property, free and clear of all liens, charges or encumbrances other than liens and encumbrances in favor of Lender and liens and encumbrances, if any, expressly permitted by the Loan Documents.

(b)     The Collateral is to be used by Borrower solely for business purposes.

(c)     The only persons having any interest in the Personal Property are Borrower, Lender and holders of interests, if any, expressly permitted hereby.

(d)     No Financing Statement, other than Financing Statements showing Lender as the sole secured party, or with respect to liens or encumbrances, if any, expressly permitted hereby; covering any of the Personal Property or any proceeds thereof is on file in any public office except pursuant hereto.

8.3     **Financing Statements.**

(a)     Borrower, at its own cost and expense, upon Lender's demand, will furnish to Lender such further information and will execute and deliver to Lender such Financing Statements and other documents in form satisfactory to Lender and will do all such acts as Lender may request at any time or from time to time or as may be necessary or appropriate to establish and maintain a first priority perfected security interest in the Personal Property as security for the Indebtedness.

(b)     Borrower will pay the cost of filing or recording such Financing Statements or other documents, in all public offices wherever filing or recording is deemed by Lender to be desirable.   Borrower hereby irrevocably authorizes Lender at any time, and from time to time, to file in any appropriate jurisdiction any initial Financing Statements and amendments thereto that (i) indicate that Lender holds a valid security interest in all assets of Borrower (or words of similar effect), regardless of whether any particular asset comprised in the Personal Property falls within the scope of Article 9 of the Code, or as being of an equal or lesser scope or within greater detail, and (ii) contain any other information required by the Code, and in the case of a Financing Statement filed as a fixture filing or indicating Collateral as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral

CH01/ 12462729.7

-43-

relates. Borrower agrees to furnish any such information to Lender promptly upon request. Borrower further ratifies and affirms its authorization for any Financing Statements and/or amendments thereto, executed and filed by Lender in any jurisdiction prior to the date of this Agreement.

8.4    **Remedies.** Upon an Event of Default hereunder, in addition to all the remedies available in Section 7.2, Lender shall have the remedies of a secured party under the Code, including, without limitation, the right to take immediate and exclusive possession of the Personal Property, or any part thereof, and for that purpose, so far as Borrower can give authority therefor, with or without judicial process, may enter (if this can be done without breach of the peace) upon any place which the Personal Property or any part thereof may be situated and remove the same in compliance with the applicable requirements of the Code; and Lender shall be entitled to hold, maintain, preserve and prepare the Personal Property for sale, until disposed of, or may propose to retain the Personal Property subject to Borrower's right of redemption, if any, as provided in the Code. Lender may render the Personal Property unusable without removal and may dispose of the Personal Property on the Property. Lender may require Borrower to assemble the Personal Property and make it available to Lender for its possession at a place to be designated by Lender which is reasonably convenient to both parties. Lender will give Borrower at least ten (10) days' notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or any other intended disposition thereof is made. The requirements of reasonable notice shall be met if such notice is mailed, by certified United States mail or equivalent, postage prepaid, to Borrower's Address at least ten (10) days before the time of the sale or disposition. Lender may buy at any public sale. Lender may buy at private sale if the Personal Property is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations. Any such sale may be held in conjunction with any foreclosure sale of the Land, the Improvements and any other Collateral. The net proceeds realized upon any such disposition, after deduction for the expenses of retaking, holding, preparing for sale, selling and the reasonable attorneys' fees and legal expenses incurred by Lender, shall be applied against the Indebtedness in such order or manner as Lender shall select. Lender will account to Borrower for any surplus realized on such disposition after the Indebtedness has been fully and finally satisfied in accordance with the applicable requirements of the Code.

8.5    **General Security Agreement Provisions.**

(a)    The terms and provisions contained in this Article 8, unless the context otherwise requires, shall have the meanings and be construed as provided in the Code.

(b)    To the extent permitted by applicable law, the security interest created hereby is specifically intended to cover all Leases between Borrower or its agents as lessor, and various tenants named therein, as lessee, including all extended terms and all extensions and renewals of the terms thereof, as well as any amendments to or replacement of the Leases, together with all of the right, title and interest of Borrower, as lessor thereunder.

(c)    Borrower agrees that:

(i)    Where Collateral is in possession of a third party, Borrower will join with Lender in notifying the third party of Lender's interest and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of Lender;

(ii)    Borrower will cooperate with Lender in obtaining control with respect to Collateral consisting of: deposit accounts, investment property, letter of credit rights and electronic chattel paper; and

(iii)    Until all of the Obligations are paid and performed in full, Borrower will not suffer, cause or permit any change in Borrower's legal status without Lender's prior written consent.

## ARTICLE 9
## GENERAL PROVISIONS

9.1    **Costs and Expenses.** Borrower unconditionally agrees to pay all Charges promptly upon demand. In case of any Default, Borrower shall pay or cause to be paid all of Lender's costs and expenses, including reasonable attorneys' fees in connection with the administration or enforcement of the Loan Documents. In addition to, and without limiting the generality of, the foregoing, if at any time hereafter prior to repayment of the Indebtedness in full and all Obligations satisfied in full, Lender employs counsel, consultants or appraisers for advice or other representation, whether or not any suit has been or shall be filed and whether or not other legal proceedings have been or shall be instituted, with respect to the Property or the marketing thereof or any of the Loan Documents, in connection with any consent, approval or amendment or to protect, collect, lease, sell, take possession of, or liquidate any of the Collateral, or to attempt to enforce any security interest or lien in any of the Collateral, or to enforce any rights of Lender or any of Borrower's obligations hereunder or those of any other person, firm or corporation which may be obligated to Lender by virtue of this Agreement or any of the other Loan Documents heretofore or hereafter delivered to Lender by or for the benefit of Borrower to defend any litigation initiated by a third-party to which Lender becomes a party, then, in any such event, all of the reasonable fees and expenses arising from such services, and all expenses, costs and charges relating thereto, shall constitute additional Indebtedness, payable on demand and shall bear interest at the Default Rate. Lender may make Advances at any time to reimburse Lender for the foregoing costs and expenses. Wherever it is provided for herein that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, all legal fees and disbursements of Lender, whether for outside firms, or for in-house counsel.

9.2    **Effect of Inspections and Investigations.** The authority herein conferred upon Lender, and any action taken by Lender, to inspect the Property, will be exercised and taken by Lender for its own protection only and shall not be relied upon by Borrower for any purpose whatsoever and any action taken by Lender or Lender's environmental consultant to review any environmental reports or to assess any environmental matters in connection with the Property will be exercised and taken by Lender and by Lender's environmental consultant for their own protection only and shall not be relied upon by Borrower for any purpose whatsoever; and neither Lender nor Lender's environmental consultant shall be deemed to have assumed any responsibility to Borrower with respect to any such action herein authorized or taken by Lender, or Lender's environmental consultant or with respect to the Property, or prevention of

mechanic's and other liens from being claimed or asserted against the Property or review and assessment of environmental matters. Any review, investigation or inspection conducted by Lender, any environmental, architectural or engineering consultants retained by Lender or any agent or representative of Lender in order to verify independently Borrower's satisfaction of any conditions precedent to Advances, Borrower's performance of any of the covenants, agreements and obligations of Borrower under this Agreement, or the validity of any representations and warranties made hereunder (regardless of whether or not the party conducting such review, investigation or inspection should have discovered that any of such conditions precedent were not satisfied or that any such covenants, agreements or obligations were not performed or that any such representations or warranties were not true), shall neither affect nor constitute a waiver by Lender of (i) any representations and warranties under this Agreement or Lender's reliance thereon or (ii) Lender's reliance upon any certifications of Borrower required under this Agreement or any other facts, information or reports furnished Lender hereunder. Lender neither undertakes nor assumes any responsibility or duty to any Borrower Party or any other party to select, review, inspect, examine, supervise, pass judgment upon or inform any Borrower Party or any third party of (a) the existence, quality, adequacy or suitability of appraisals of the Property or any other Collateral, (b) any environmental report, or (c) any other matters or items, including, but not limited to, engineering, soils and seismic reports which are contemplated in the Loan Documents. Any such selection, review, inspection, examination and the like, and any other due diligence conducted by Lender is solely for the purpose of protecting Lender's rights under the Loan Documents, and shall not render such Lender liable to any Borrower Party or any third party for the existence, sufficiency, accuracy, completeness or legality thereof.

9.3    **Acquiescence not to Constitute Waiver of Lender's Requirements.** Each and every covenant and condition for the benefit of Lender contained in this Agreement may be waived by Lender, provided, however, that, to the extent that Lender may have acquiesced in any noncompliance with any conditions precedent to the Initial Disbursement or any Advance, such acquiescence shall not be deemed to constitute a waiver by Lender of any such conditions precedent with respect to any future disbursements of Loan proceeds.

9.4    **Protective Advances by Lender.** Lender shall have the right, but not the obligation, to do any and all acts which Lender may deem reasonably necessary to assure the protection of the Collateral and the lien or charge of the Loan Documents, including, but not limited to, during the continuance of an Event of Default and in addition to the rights under Article 7 and Article 8 hereof and any remedies set forth in the other Loan Documents, the settlement, compromise or contest of any Lien or claim of Lien, the taking of possession of the Property and Completion of all Construction Work and the commencement of, appearance in, or defense of any action or proceeding purporting to affect the rights, obligations or duties of the parties hereto. Any expense paid or incurred, or any advance made by Lender in such connection, shall be paid by Borrower to Lender upon demand. Such amounts as are advanced or expended by Lender hereunder and any other amounts advanced by Lender pursuant to this Agreement or any other the other Loan Documents shall constitute Indebtedness and shall bear interest from the date of advance or expenditure until repayment at the Default Rate.

9.5    **Increased Costs.** Borrower agrees to pay Lender additional amounts to compensate Lender for the reduction of any amounts received or receivable from Borrower as a result of any change after the date hereof in any applicable law or by any domestic or foreign

court, changing the basis of taxation of payments under this Agreement to Lender excluding taxes imposed on or measured by the net income or receipts of Lender or any franchise tax or similar tax imposed on Lender. Any amount payable by Borrower under this Section 9.5 shall be paid within five (5) days of receipt by Borrower of a notice by Lender setting forth the amount due and the basis for the determination of such amount, which statement shall be conclusive and binding upon Borrower absent manifest error. Failure on the part of Lender to demand payment from Borrower for any such amount attributable to any particular period shall not constitute a waiver of Lender's right to demand payment of such amount for any subsequent or prior period.

9.6     **Tax Liability.** If, by reason of a change in any applicable tax, banking or lending laws or regulations occurring after the date hereof, (a) Borrower is required to make any deduction or withholding in respect of any taxes, duties or other charges from any payment due under the Loan Documents, (b) Lender is charged with responsibility for the payment of all or any part of the Impositions or (c) the method of collecting Impositions is changed so as to affect Lender's rights under this Agreement or any other Loan Document, or the liens and security interests granted under the Loan Documents, then upon Lender's demand Borrower shall pay to Lender the amount determined by Lender as necessary to fully compensate Lender for all losses that Lender may suffer as a result of such change; provided that if Lender determines that it may be unlawful to charge Borrower for such losses then Lender shall have the right to declare all Indebtedness (including, without limitation, the Exit Fee) to be fully due and payable not earlier than ninety (90) days from the date of such declaration without prepayment premium or penalty.

9.7     **Document and Recording Tax Indemnification.** Borrower agrees to indemnify, defend and hold harmless Lender from and against any claim that any documentary stamp or mortgage tax is due and payable in connection with the Loan or the execution, delivery or recording of the Loan Documents and to pay such taxes and expenses incurred by Lender in connection therewith. Borrower may contest any determination that any such taxes are due, but shall pay any such taxes (including penalties and interest) when legally required. The indemnity obligations contained in this Section shall survive repayment of the Loan.

9.8     **Assignments and Participations.** Lender may, at any time or times and without Borrower's consent, make a Loan Transfer, grant any Participation or sell and assign the Loan and the Loan Documents in connection with a Securitization.

9.9     **Cooperation.** Borrower shall, and shall cause each of the other Borrower Parties to, reasonably cooperate with Lender in connection with servicing the Loan, any Loan Transfer, Participation, Securitization or any other financing created or obtained in connection with the Loan and, if Lender elects at any time, in connection with the creation tranches of the Loan or splitting the Loan into separate Loans (in the aggregate amount of the Loan Amount) having different priorities, including signing new notes and amendments to this Agreement and the other Loan Documents evidencing such tranches or splitting of the Loan, provided Lender shall reimburse Borrower for reasonable out-of-pocket expenses actually incurred relating to such a Loan Transfer, Participation or Securitization and provided that the Loan Amount, the Interest Rate, timing of payments by Borrower and other economic and/or material terms of the Loan shall not, taken as a whole, be changed as a result thereof.

9.10    **Disclosure of Information.**

(a)     Lender shall have the right to make available to any party for the purpose of any Loan Transfer, Participation, Securitization or any other financing created or obtained in connection with the Loan (including any prospective purchaser, any Rating Agency, any Governmental Authority and any prospective bidder at any foreclosure sale of the Property) any and all information that Lender may have with respect to the Property, or any Borrower Party, whether provided by Borrower, any Guarantor or any third party or obtained as a result of any environmental assessments. Borrower and Guarantor agrees that Lender shall have no liability whatsoever as a result of delivering any such information to any third party, and Borrower and each Guarantor, on behalf of itself and its successors and assigns, hereby releases and discharges Lender from any and all liability, claims, damages, or causes of action, arising out of, connected with or incidental to the delivery of any such information to any third party. Borrower and each Guarantor irrevocably waives any and all rights it may have under applicable state or federal law to prohibit disclosure, including but not limited to any right of privacy. Further Borrower and each Guarantor acknowledges that such information may be transmitted via the internet or by email.

(b)     Without limiting Section 9.10(a), all news releases, publicity or advertising by the Borrower or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to the Borrower or Lender, shall be subject to the prior written approval of Lender, such approval of Lender not to be unreasonably withheld or delayed. Notwithstanding the foregoing, the Borrower and its Affiliates shall use commercially reasonable efforts to keep all information obtained in connection with the transaction described in this Agreement, confidential, except that any such party, as applicable, may disclose any such information (a) its auditors, attorneys and other consultants in connection with the transaction described in this Agreement (each such recipient being informed of the confidential nature of such information and directed to keep the same confidential), (b) to the extent required by any Applicable Law, and (c) if such information is otherwise available to the public not through a breach hereof.

9.11    **Notices.** All Notices shall be in writing and shall be (a) delivered in person, in which event the Notice shall be deemed received when delivery (or refusal of receipt) is actually made, (b) sent by facsimile, in which event the Notice shall be deemed received on the date of transmission if transmission is confirmed before 4:00 p.m. Chicago time on a Business Day or if transmission is confirmed after 4:00 p.m. Chicago time, then on the next Business Day provided that the sender obtains electronic confirmation of receipt and that a copy of such Notice is also delivered pursuant to clause (a) or (c); or (c) sent by a nationally recognized overnight courier for next Business Day delivery, in which event the Notice shall be deemed received on the first Business Day after delivery to, and acceptance for delivery by, the courier. All such Notices shall be addressed to the party for whom the Notice is intended, with a copy to its attorney, at their respective Addresses indicated in Section 1.1 of this Agreement and if sent by facsimile such Notices shall be sent to the facsimile number set forth in Section 1.1. Either party may change its Address or facsimile number by giving written notice to the other in accordance with the foregoing notice provision.

9.12    **No Waiver; Rights and Remedies Cumulative.** No failure by Lender to exercise, or delay by Lender in exercising, any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege

hereunder preclude any other or further exercise thereof, or the exercise of any other right, power or privilege. The rights and remedies provided in this Agreement are cumulative and not exclusive of any right or remedy provided by law. No notice to or demand on Borrower in any case shall, in itself, entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand.

9.13    **Inurement.** This Agreement and the Loan Documents shall be binding upon and inure to the benefit of the respective parties hereto and their respective successors and assigns, provided that no assignment by Borrower shall be effective, except as provided herein.

9.14    **Form of Documents.** All documents and other matters required by any of the provisions of this Agreement to be submitted or furnished to Lender shall be in form and substance satisfactory to Lender.

9.15    **Time is of the Essence.** Time is hereby declared to be of the essence of this Agreement and of every part hereof.

9.16    **Entire Agreement.** This Agreement and the other Loan Documents constitute the entire agreement between the parties hereto and may not be modified or amended in any manner other than by supplemental written agreement executed by the parties hereto. This Agreement supersedes any other agreement, oral or written, made by Lender with or for the benefit of Borrower.

9.17    **Governing Law.** THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE TERMS OF THE LOAN EVIDENCED HEREBY AND THEREBY WERE EACH NEGOTIATED IN THE STATE OF ILLINOIS, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, INCLUDING WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. THEREFORE, THIS AGREEMENT SHALL BE CONSTRUED AND INTERPRETED WITH, AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS (WITHOUT GIVING EFFECT TO ILLINOIS CHOICE OF LAW PRINCIPLES); PROVIDED, HOWEVER, THAT THE LAWS OF THE STATE WHERE THE LAND IS LOCATED SHALL APPLY TO THE CREATION, PERFECTION AND ENFORCEMENT OF ANY LIENS, SECURITY INTERESTS AND ENCUMBRANCES GRANTED OR CREATED BY THE MORTGAGE ON REAL PROPERTY LOCATED IN THE STATE WHERE THE LAND IS LOCATED, AND THE MANAGEMENT, OPERATION, DISPOSITION AND REALIZATION OF THE SECURITY PROVIDED THEREBY. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE LAWS OF THE STATE OF ILLINOIS SHALL APPLY TO ALL MATTERS RELATING TO THE CHARGING AND COLLECTION OF INTEREST AND FEES UNDER THE LOAN DOCUMENTS.

9.18    **Captions.** The captions and headings of various Articles and Sections of this Agreement and Exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

References to any Section or Sections shall be deemed to refer to Sections of this Agreement unless otherwise indicated.

9.19 **Modification, Waiver.** No modification, waiver, amendment, discharge or change of this Agreement shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment, discharge or change is sought.

9.20 **Counterparts.** This Agreement may be signed in multiple counterparts, each of which constitute an original and, taken together, shall constitute a single agreement.

9.21 **Detached Signatures.** Borrower certifies that Borrower's Counsel has been delegated the power to authorize Lender, or Lender's Counsel, to attach signature pages of Borrower, Guarantors and if applicable any Affiliate of Borrower, to the final, compiled versions of each of the Loan Documents. Borrower further agrees that should any dispute arise as to which version of the Loan Documents is the "final" version, the computer files maintained by Lender's Counsel, including without limitation any records of email communications, shall be conclusive except in the case of manifest error.

9.22 **Partial Invalidity; Severability.** If any of the provisions of this Agreement or the other Loan Documents, or the application thereof to any person, party or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the other Loan Documents, or the application of such provision or provisions to persons, parties or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law and to this end, the provisions of this Agreement and all the other Loan Documents are declared to be severable. All covenants and agreements of Borrower and Guarantors shall be joint and several.

9.23 **Definitions Include Amendments.** Definitions contained in this Agreement and the Appendix which identify documents, including, but not limited to, the Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments, modifications, and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Lender. Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

9.24 **Waiver of Damages.** In no event shall Lender be liable to Borrower for punitive, exemplary or consequential damages, including, without limitation, lost profits, whatever the nature of a breach by Lender of its obligations under this Agreement or any of the Loan Documents, and Borrower waives all claims for punitive, exemplary or consequential damages.

9.25 **Claims Against Lender.** Lender shall not be in default under this Agreement, or under any other Loan Documents, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender within thirty (30) days after Borrower

first had Knowledge of the occurrence of the event which Borrower alleges gave rise to such claim and Lender does not remedy or cure the default, if any there be, promptly thereafter.

9.26 **Set-Offs.** After the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably authorizes and directs Lender from time to time to charge Borrower's accounts and deposits with Lender or its Affiliates, and to pay over to Lender an amount equal to any amounts from time to time due and payable to Lender hereunder, under the Note or under any other Loan Document.

9.27 **Relationship.** The relationship between Lender and Borrower shall be that of creditor-debtor only. No term in this Agreement or in the other Loan Documents and no course of dealing between the parties shall be deemed to create any relationship of agency, partnership or joint venture or any fiduciary duty by Lender to Borrower or any other party.

9.28 **Agents.** In exercising any rights under the Loan Documents or taking any actions provided for therein, Lender may act through its employees, agents or independent contractors as authorized by Lender.

9.29 **Waiver of Marshaling of Assets.** To the fullest extent Borrower may legally do so, Borrower waives all rights to a marshaling of the assets of Borrower, Guarantors, its members, if any, and others with interests in Borrower and of the Collateral, or to a sale in inverse order of alienation in the event of foreclosure of the interests hereby created, and agrees not to assert any right under any laws pertaining to the marshaling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of any of the Collateral for the collection of the related debt without any prior or different resort for collection, or the right of Lender to the payment o the related debt out of the net proceeds of the Collateral in preference to every other claimant whatsoever. In addition, Borrower, for itself and its successors and assigns, waives in the event of foreclosure of the Mortgage, any equitable right otherwise available to Borrower which would require the separate sale of portions of the Property.

9.30 **Conflict.** In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.

9.31 **Brokers and Financial Advisors.** Borrower will be solely responsible for any fee that may be payable to Broker. Other than Broker, Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transaction contemplated by this Agreement. Borrower hereby indemnifies Lender and holds Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way relating to or arising from a claim by a financial advisors, brokers, placement agents or finders that such Person acted on behalf of Borrower in connection with the transactions contemplated herein. The provisions of this Section 9.31 shall survive the expiration and termination of this Agreement and the repayment o the Indebtedness.

9.32 **No Third Party Beneficiaries.** This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower, and nothing contained in this

Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and Borrower, and not other person or entity shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and not other person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in pat by Lender if, Lender's sole discretion, Lender deems it advisable or desirable to do so.

9.33 **Waiver of Jury Trial.** BORROWER AND LENDER EACH HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR BASED UPON, OR ARISING OUT OF, THE SUBJECT MATTER OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY BORROWER AND LENDER, AND BORROWER ACKNOWLEDGES THAT NEITHER LENDER NOR ANY PERSON ACTING ON BEHALF OF LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS WHICH IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. BORROWER AND LENDER EACH ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH OF THEM HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THE LOAN DOCUMENTS AND THAT EACH OF THEM WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS.

9.34 **Consent To Jurisdiction.** BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE COUNTY OF COOK, STATE OF ILLINOIS AND IRREVOCABLY AGREES THAT, SUBJECT TO LENDER'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS. BORROWER EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO BORROWER, AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

9.35 **Definitional Provisions.** All terms defined in Schedule 1.2 attached to and made a part of this Agreement or defined elsewhere in this Agreement shall, unless otherwise defined therein, have the same meanings when used in the Note, Mortgage, any other Loan Documents, or any certificate or other document made or delivered pursuant hereto. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement. The word "include(s)" when used in this Agreement

and the other Loan Documents means "include(s), without limitation," and the word "including" means "including, but not limited to."

9.36 **Interpretation**. With respect to all Loan Documents, whenever the context requires, all words used in the singular will be construed to have been used in the plural, and vice versa, and each gender will include any other gender. The word "Obligations" is used in its broadest and most comprehensive sense, and includes all primary, secondary, direct, indirect, fixed and contingent obligations, as well as all obligations to perform acts or satisfy conditions. No listing of specific instances, items or matters in any way limits the scope or generality of any language in the Loan Documents. This Agreement and all of the other Loan Documents shall not be construed more strictly against one party than against the other, merely by virtue of the fact that it may have been prepared primarily by counsel for one of the parties. Unless otherwise specified, any matter requiring Lender's consent or approval shall be interpreted as requiring Lender's consent or approval in the exercise of its sole and absolute discretion, and any such consent or approval shall be in writing, unless otherwise specifically indicated.

**[The next page is the signature page]**

Bristol Court

**IN WITNESS WHEREOF,** the parties hereto caused this Agreement to be executed as of the day and year first above written.

BORROWER:

**THE LANDINGS FLORIDA, LLC,**
a Florida limited liability company

By:    The Landings Florida Member, LLC,
a Delaware limited liability company,
Its Sole Member and Manager

      By:    Spinnaker/Regatta V, LLC,
a Washington limited liability company,
Its Sole Member and Manager

          By:    CVI/Spinnaker/Regatta V, Inc.,
a Washington corporation,
Its Manager

          By: _____
Name: Richard Nathan
Title:   President and Sole Director

LENDER:

**ORIX REAL ESTATE CAPITAL, INC.,** a Delaware corporation

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties hereto caused this Agreement to be executed as of the day and year first above written.

**BORROWER:**

**THE LANDINGS FLORIDA, LLC,**
a Florida limited liability company

By:   The Landings Florida Member, LLC,
     a Delaware limited liability company,
     Its Sole Member and Manager

     By:   Spinnaker/Regatta V, LLC,
          a Washington limited liability company,
          Its Sole Member and Manager

          By:   CVI/Spinnaker/Regatta V, Inc.,
               a Washington corporation,
               Its Manager

               By: _____
               Name: Richard Nathan
               Title:   President and Sole Director

**LENDER:**

**ORIX REAL ESTATE CAPITAL, INC.**, a Delaware corporation

By: _____
Name: _____
Title: _____
     ~~Michael J. Moran~~
     SVP & General Counsel

## SCHEDULE 1.2

The following terms shall have the following meanings:

"**Accrued Interest**" means all accrued and unpaid interest on the outstanding principal balance of the Loan from time to time.

"**ACH**" means a pre-authorized Automated Clearinghouse transaction.

"**Advance**" means (a) each advance of any portion of the Loan Amount other than the Initial Disbursement and (b) each advance from the CapEx Reserve, the Fire Damage Reserve or the Retaining Wall Reserve.

"**Affiliate**" means with respect to a specified Person, any other Person which, directly or indirectly, through one or more intermediaries, Controls or is Controlled by or is under common control with such Person, including, without limitation, any general or limited partnership in which such Person is a partner, or any such Person's immediate family members, direct ancestors or descendants of a person.

"**Agreement**" means this Loan Agreement.

"**Applicable Laws**" means all applicable statutes, laws, treaties, regulations, rules, ordinances or orders of any kind whatsoever, including court decisions interpreting, administering or applying the foregoing. The term Applicable Laws shall include all zoning or building laws or ordinances; all environmental protection laws or regulations, including, without limitation, all Environmental Laws; any rules, regulations orders of any governmental agency, department, commission, board, bureau or other instrumentality or Governmental Authority; any building or environmental permit issued to Borrower or in respect of the Property; any order, writ or injunction of any court having jurisdiction over Borrower or the Property; and any condition, easement, right of way, covenant or restriction of record affecting Borrower or the Property.

"**Appraisal**" means a market appraisal of the Property prepared by a licensed MAI appraiser engaged or approved by Lender and satisfies either (a) the requirements of the "Uniform Standards of Professional Appraisal Practice" as adopted b the Appraisal Standards Board of the Appraisal Foundation, or (b) the guidelines in Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, in either case as in effect on the Closing Date.

"**Approved CapEx Expenses**" means costs and expenses actually incurred by Borrower for repairs or improvements to the Property (other than tenant improvement costs) which (i) are noted on **Exhibit G** attached hereto, including the Immediate Repairs or (ii) have been approved by Lender in its discretion.

"**Approved Lease**" means a Lease entered into after the date of this Agreement in compliance with the applicable terms and provisions of this Agreement.

"**Approved Plans**" means complete plans, drawings, specifications and scope of work, that comply with Applicable Laws and have been approved in writing by Lender, for any

Construction Project.

"**Architect**" means the licensed architect, if any, engaged by Borrower in connection with a Construction Project.

"**Asset Manager**" has the meaning set forth in Section 5.3.7.

"**Authorizing Entity**" means each corporation, partnership, limited partnership, limited liability company or other legal entity whose consent or authorization is required for Borrower to enter into, and perform its obligations under, this Agreement and the other Loan Documents.

"**Bankruptcy Code**" means Chapter 11 of Title II of the United States Code (11 U.S.C. §101 *et seq.*), as it may be amended, restated, replaced or superseded from time to time.

"**Basis Point**" means one one-hundredth of one percent.

"**Blocked Account**" means an account subject to a bank account control agreement among Borrower, Lender, the depository bank and, if applicable, the Property Manager in form and substance satisfactory to Lender.

"**Borrower**" has the meaning set forth in Section 1.1.1.

"**Borrower's Address**" has the meaning set forth in Section 1.1.1.

"**Borrower's Counsel**" has the meaning set forth in Section 1.1.1.

"**Borrower's Counsel's Address**" has the meaning set forth in Section 1.1.1.

"**Borrower's Knowledge**" means the actual knowledge, after reasonable inquiry, of any Guarantor, the general partner or managing member of Borrower (or if the general partner or managing member is an entity, each controlling shareholder, individual general partner or managing member of such entity), and each individual officer, employee or representative of a Borrower Party or Property Manager who exercises supervisory authority or has supervisory responsibilities with respect to the Property.

"**Borrower's Legal Status**" has the meaning set forth in Section 1.1.1.

"**Borrower Parties**" means, collectively, Borrower, each Authorizing Entity and each Guarantor; and "**Borrower Party**" means any of the foregoing individually.

"**Borrower Return**" has the meaning set forth in Section 2.6.

"**Broker**" has the meaning set forth in Section 1.1.5.

"**Business Day**" means any weekday other than any holiday in the State of Illinois during which banks are required or authorized to be closed.

"**CapEx Holdback**" has the meaning set forth in Section 1.1.4.

"**CapEx Reserve**" has the meaning set forth in <u>Section 1.1.3</u>.

"**Change Order**" means any modification, addition or other change either to any Construction Document after it has been approved by Lender, or to the scope or specifications of any Construction Project after the same have been approved by Lender.

"**Charges**" means costs and expenses of the Loan, and any and all other fees owing to Lender pursuant to the Loan Documents, including all reasonable costs and expenses incurred by Lender in connection with the documentation of the Loan or any modification, extension, renewal or amendment thereof, all workout costs relating to the Loan, all recording, filing and registration fees and charges, mortgage or documentary taxes, UCC searches, title and survey charges, all fees and disbursements of Lender's attorneys and consultants, any out-of-pocket costs involved in the disbursement and administration of the Loan, any repair or maintenance costs incurred by Lender with respect to the Property, all payments made to remove or protect against Liens other than those which are Permitted Exceptions or otherwise for the protection of the Collateral, all costs and expenses incurred by Lender in connection with the determination of whether or not Borrower has performed the obligations undertaken by Borrower hereunder or has satisfied any conditions precedent to the obligations of Lender hereunder, and any out-of-pocket costs in connection with evaluating any Borrower request, including any request for consent or approval of any matter, regardless of whether it is granted, including the review of any proposed Lease or non-disturbance and attornment agreement.

"**Closing Checklist**" means the checklist prepared by Lender and furnished to Borrower of documents, certificates, reports, surveys, title property insurance requirements and other items and deliveries that Borrower is obligated to deliver or satisfy as a condition to the Initial Disbursement.

"**Closing Date**" means the date the Initial Disbursement is made.

"**Code**" means the Uniform Commercial Code as adopted in the State of Illinois, as amended from time to time.

"**Collateral**" means the Property and all other assets of Borrower, whether now owned or hereafter acquired, and all proceeds thereof.

"**Commitment Fee**" has the meaning set forth in <u>Section 1.1.4</u>.

"**Committed Amount**" means, as of any date of determination the principal balance of the Loan <u>plus</u> any undisbursed portions of the Holdback.

"**Completion**" or "**Complete**" means one hundred percent (100%) completion of construction, subject to usual and customary punch list items, in a good and workmanlike manner and in compliance with all Applicable Laws and private restrictions included in Permitted Exceptions, and in a manner consistent and compliant in all material respects with the applicable Construction Documents as approved by Lender, and free and clear of all liens, claims, encumbrances and rights of others, other than Permitted Exceptions, as evidenced by the issuance of certificates of completion by Lender's consultant or inspecting architect or engineer, if any, Borrower's architect and the general contractor, in each case in form and substance

acceptable to Lender and, if available or required under Applicable Law, a final or partial certificate of occupancy and, as applicable, acceptance of completion by the applicable tenant.

"**Condition Report**" has the meaning set forth in <u>Section 5.2.6</u>.

"**Construction Contracts**" means each contract or agreement to which Borrower or any agent of Borrower is a party, providing for the provision of construction services (including architect's or engineering services), labor or material in connection with any of the Construction Work.

"**Construction Documents**" means each of the following as approved by Lender with respect to each Construction Project: the Approved Plans, a completion schedule, the Project Budget and the applicable Construction Contracts.

"**Construction Project**" means and refers to each discrete Construction Work project; provided separate phases or stages of work relating to a single improvement or project shall be considered part of a single Construction Project. For example, any buildout of tenant space by Borrower, and any capital improvements to the Property, including renovations and additions, will constitute a Construction Project.

"**Construction Work**" means all interior or exterior construction and construction-related activities, including without limitation, any tenant improvements, renovations, alterations, additions, expansions, capital improvements, repairs and replacements to or at the Improvements.

"**Contested Taxes**" means any Impositions which Borrower is contesting in accordance with the provisions of the Loan Documents.

"**Control**" or "**Control**": As such term is used with respect to any entity, including the correlative meanings of the terms "controlled by" and "under common control with", shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such person or entity through the ownership of 50% or more of the outstanding voting securities in such entity.

"**CVI**" has the meaning set forth in <u>Section 1.1.1(e)</u>.

"**Debt Service**" means, for the period of determination, the product obtained by multiplying the principal balance of the Loan by the greater of (a) the Interest Rate as of the date of determination and (b) seven and one-half percent (7.5%).

"**Default**" means the existence of any circumstance or the occurrence of any event which with the passage of time or the giving of notice, or both, would constitute an Event of Default.

"**Default Rate**" has the meaning set forth in <u>Section 1.1.4</u>.

"**Deficiency**" means (a) with respect to any Construction Project, the amount, if any, by which the cost to Complete such Construction Project exceeds the sum of any retainage